L. K. THOMPSON *et al. v.* EXCHANGE BUILDING COMPANY *et al.**

(*Jackson.*    April Term, 1928.)

Opinion filed July 16, 1928.

### 1. CORPORATIONS. STOCK. DIVIDENDS. OPTION.

The law seems to be well settled to the effect that where an option to purchase stock of a corporation is given, and, before the option is exercised, a dividend is declared, it goes to the person giving the option.   (Post, p. 283.)

### 2. CORPORATIONS. STOCK. DIVIDENDS. SALE FOR FUTURE DELIVERY.

Where a contract of purchase of capital stock of a corporation has been entered into, but the delivery of the stock and the payment of the purchase price has been deferred, and, before the contract is executed, a dividend is declared, it goes to the purchaser.   (Post, p. 286.)

Citing: Lafountain & Woolson v. Brown (Vt.), 101 Atl., 36; Bank of Waverly v. Daily (Neb.), 170 N. W., 183; Rossi v. Rex Consolidated Mining Co., 183 Pac., 120; Saultine v. Straud, C. C. A. 8th Cir., 5 Fed. (2nd), 809; Curry v. White, 45 N. Y., 822; Harris v. Stevens, 7 N. H., 454; Black and others, claimants and Homersham, defendant, L. R. 4 Exc. Div., 24, 39 L. T. (N. S.), 671; 48 L. J. Exc., (N. S.), 79; 7 R. C. L., 292.

Distinguishing: Wallin v. Lumber & Mfg. Co., 136 Tenn., 124.

### 3. CORPORATIONS. STOCK. CONTRACT OF SALE. OPTION. EVIDENCE.

A contract for the sale of the capital stock of a corporation which provides that the certificates for a certain number of shares,

properly endorsed, shall be placed in escrow in a certain bank, to be paid for at a definite price on or before a definite date; that the purchasers shall deposit in escrow concurrently a definite sum of money to be forfeited if the purchase price is not paid according to contract, but containing provisions for the substitution of other shares of stock in said corporation for those deposited in escrow, is a contract of sale and not an option. It is plain and unambiguous and no testimony is admissible to vary or contradict the terms thereof. (Post, pp. 283-286.)

Citing: Fourth Nat. Bank v. Stahlman, 132 Tenn., 367; Maxwell v. Huntingdon Refrigerator Co., 120 S. E., 522; Western Union Telegraph Co. v. Brown, 253 U. S., 101, 64 L. Ed., 803; Fry on Specific Performance (5 Ed.), p. 70; Story's Equity Jurisprudence, vol. 2, p. 28, sec. 715.

4. CONTRACT OF SALE. OPTION. LIQUIDATED DAMAGES.

The mere fact that the contract provides for liquidated damages does not convert the contract of sale into an option, but, in the absence of a provision to the contrary, merely gives the seller the choice of enforcing his full rights against the purchaser, or claiming the amount stipulated as liquidated damages. (Post, p. 286.)

Citing: Stewart v. Griffith, 217 U. S., 323, 54 L. Ed., 782; Western Union Telegraph Co. v. Brown, 253 U. S., 101, 64 L. Ed., 803; Fry on Specific Performance (5 Ed.), p. 70; Story's Equity Jurisprudence, vol. 2, p. 28, sec. 715; Sedwick on Damages (9 Ed.), vol. 1, sec. 426, p. 824; Southerland on Damages (4 Ed.), vol. 1, sec. 297, p. 926; Cincinnati-Louisville Theatre Co. v. Masonic Widows and Orphans Infirmary, 272 Fed., 637; Dana v. St. Paul Investment Co., 44 N. W., 55; Rogers v. Lowrance, 117 Atl., 564; Eaton v. Sadler, 110 So., 10; First Trust & Savings Bank of Rockhill v. Pruitt (S. C.), 113 S. E., 469; Powell v. Dwyer (Mich.), 112 N. W., 499; Barrett v. Wiskus (Iowa), 196 N. W., 14; O'Brien v. Paulsen (Iowa), 186 N. W., 440.

5. CORPORATION. STOCK. DIVIDENDS FOR FUTURE PAYMENT. SALE OF STOCK.

Where directors at an annual meeting declared and set apart a dividend to the stockholders, to be held in the treasury and paid out at a later date on the order of the board, the declaration of

the dividend had the effect to segregate the amount from the corporation's assets, leaving it disassociated from the capital stock, the law implying a promise at the time of its declaration to pay to the then stockholders their proportionate amounts, so that the dividend did not pass as an incident to the stock certificates transferred before the order of the board for its payment, but as between transferor and transferee, remained the property of the transferors, but where stock is sold for delivery after the dividend is declared, if the dividend should go to the seller it would permit him to reduce the value of the stock to the amount of the dividend declared. (Post, p. 287.)

Citing: Wallin v. Lumber & Mfg. Co., 136 Tenn., 124; Lafountain & Woolson Co. v. Brown (Vt.), 101 Atl., 36; Bank of Waverly v. Daily (Neb.), 170 N. W., 183; Harris v. Stevens, 7 N. H., 454; Black and others, claimants and Homersham, defendant, L. R. 4 Exc. Div., 24, 39 L. T. (N. S.), 671; 48 L. J. Exc. (N. S.), 79; 7 R. C. L., 292.

### 6. CONTRACTS.  OPTION.  SALE.  CONSTRUCTION.  EVIDENCE.

The bare statement that one "was to have an option" carries little force, since the parties refer to the written contract of sale, in its present form, as an option. "If the parties intended to use the words in the sense which they really convey, if the thought to be expressed was the idea the parties intended to convey, then there is no mistake of fact, but one only of legal consequences." (Post, p. 291.)

Citing: Helm v. Wright, 2 Humph., 75; Alexander v. Shapard, 146 Tenn., 90.

### 7. CORPORATIONS.  STOCK.  CONTRACT OF SALE.  MODIFICATION.  DIVIDENDS.  UNIFORM SALES LAW.

Where it appears that a sale of corporation stock was made, providing for future consummation so as to entitle the purchaser to dividends subsequently declared and the contract was subsequently amended so as to include one hundred fifty shares more and pay a bonus, the purchaser is entitled to the dividends on

said one hundred fifty shares. The sale of such stock does not come within the provision of the Uniform Sales Law. (Post, p. 292.)

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County.—HON. D. W. DeHAVEN, Chancellor.

WILSON, GATES & ARMSTRONG, for defendants, appellants.

CHANDLER, SHEPHERD & OWEN, RIDDICK & RIDDICK and METCALF & APPERSON, for complainants, appellees.

MR. CHIEF JUSTICE McKINNEY delivered the opinion of the Court.

On June 9, 1925, the Board of Directors of the Exchange Building Company declared a 20 per cent dividend upon its common stock.

The original bill was filed by L. K. Thompson, C. D. Smith and A. S. Caldwell to recover $38,700 of said dividend upon the theory that they had entered into a written contract for the purchase of 1787½ shares and 150 shares of the common stock of said Exchange Building Company prior to the date on which said dividend was declared, and that said contracts of purchase were executed shortly after said dividend was declared, and they charge that as a matter of law they were entitled to said dividend. This is one of the questions involved in the litigation.

A second question for determination is whether the written agreement relative to the purchase of said stock constitutes in law an agreement to purchase, or whether it is only an option to prospective purchasers.

The third question is, if the court finds that the written agreement is one to purchase, are cross complainants entitled to have it reformed so as to make it an option to buy only?

There is a fourth question for decision, which will be stated when we come to deal with the sale of 150 shares of stock by C. G. Smith.

The Exchange Building Company is a Tennessee corporation organized under the laws of the State of Tennessee in 1919, and owns and operates one of the large office buildings in the City of Memphis. The capital stock of the corporation consists of 3500 shares of common stock of the par value of $100, and 3,000 shares of preferred stock of the same par value. The building itself has a mortgage upon it of $400,000.

The common stock was originally owned in equal moieties by the Memphis Merchants Exchange and the Memphis Cotton Exchange. In 1920 the Merchants Exchange purchased the 1750 shares of common stock owned by the Cotton Exchange for a consideration of $300,000, payable over a period of years. This purchase was paid for in four years out of the earnings of the corporation. The corporation had never declared a dividend prior to June 9, 1925.

After said purchase money was fully paid, the Merchants Exchange prorated the common stock of said corporation among its members. After said allotment a group of the members of the Merchants Exchange organized a pool of their respective shares, representing

in all 1787½ shares of the common stock, which were placed by the members of the pool into the hands of V. L. Rogers, S. T. Pease, S. F. Clark, W. R. Smith Vaniz, T. P. Andrews and L. P. Cook as trustees.

The object in pooling said stock was to concentrate a majority of the stock of the corporation for voting purposes so as to centralize the responsibility, control and management of the affairs of the corporation, and these shares of stock were deposited by those constituting the pool under a voting trust agreement. These trustees of the pool constituted the Board of Directors of the corporation, and owned individually a large part of the pooled stock.

C. G. Smith was the secretary and general manager of the Exchange Building Company, and had been such for some years, and was thoroughly familiar with its affairs, its earning capacity, financial status, etc.

In April, 1925, C. G. Smith entered into negotiations with said trustees for the purchase of said 1787½ shares of stock, and, having reached a verbal agreement, he presented to said trustees on April 21, 1925, a written contract, which was executed by all parties, and which is the basis of this litigation. Said contract was prepared for Mr. Smith by Elias Gates, a member of the Memphis Bar.

While said contract was taken in the name of C. G. Smith, it appears that Smith had other gentlemen associated with him in the transaction, but their interests, as well as that of C. G. Smith, was subsequently acquired by L. K. Thompson and associates prior to June 9, 1925, by assignment, but we deem it unnecessary to detail all the intermediate negotiations had between these parties

It is proper to say that when C. G. Smith assigned said contract to L. K. Thompson it was done with the understanding that said C. G. Smith was to become a fourth owner in the purchase of said stock, and that L. K. Thompson was to finance the deal for Smith.

Thompson was dependent upon two friends for financial support to enable him to consummate said purchase. One of these friends declined to become a party to the transaction if C. G. Smith was to be associated with them, and Thompson was unable to finance the deal without the aid of this friend. He frankly told Smith about the situation, and, after some negotiations, it was agreed that in consideration of the purchase of 150 shares of stock owned and controlled by Smith outside of the pool, and a bonus of $10,000, Smith was to waive and release his right to acquire a one-fourth interest in the pooled stock.

It is apparent from the record that C. G. Smith became very sore at Thompson and his associates on account of being forced out in the manner indicated, and became thereafter unfriendly to Thompson and associates and very friendly to the trustees.

The Chancellor and the Court of Appeals concurred in finding that Thompson acted in the utmost good faith toward Smith and practiced no fraud upon him.

It might be said at this point that the Chancellor further found all of the issues involved, as heretofore stated, in favor of the original complainants, and the finding of the Chancellor and his decree was concurred in by the Court of Appeals.

On June 4, 1925, Thompson entered into a verbal agreement with C. G. Smith for the purchase of his 150 shares of stock, but Smith did not present said stock for pay-

ment until June 12th (three days after the dividend was declared), when Thompson paid him for same, less $3,000 representing the dividend, which it was agreed should not prejudice the rights of either party with respect to who was lawfully entitled to said dividend.

Under said written contract of April 21, 1925, the vendee or optionee, Smith, had until June 20, 1925, in which to complete the purchase or acquire said stock.

At the time said dividend was declared the corporation had cash on hand, or its equivalent, amounting to $77,000. A good part of this was deposited on time with one of the local banks on a certificate drawing interest, and which was not due on June 9th.

In acquainting Mr. Thompson with the financial condition of the corporation Mr. Smith had advised him of this cash asset of $77,000. The fiscal year of the corporation ended on December 31st, and the by-laws provided that the stock books should be closed thirty days before a dividend was declared, which was not observed in this instance.

In this situation the Board of Directors met on June 9, 1925, declared a 20 per cent dividend, and ordered it paid immediately. At the same time they declared a 7 per cent dividend on preferred stock, payable July 1, 1925.

The original bill in this cause was filed on June 11, 1925, for the purpose of enjoining the payment of dividends on said 1787½ shares and the 150 shares, and the injunction was served upon the bank in time to stop most of the dividend payments. The agreement for the purchase of said 1787½ shares was finally concluded on June 21, 1921, the purchasers paying the full price agreed upon, and thereafter amended their original bill so as

to seek a recovery of said dividends from said trustees and C. G. Smith.

Both courts held that the Board of Directors were within their legal rights in declaring said dividend, and that in so doing they practiced no fraud upon the complainants.

*(1)* The law seems to be well settled to the effect that where an option to purchase stock of a corporation is given, and, before the option is exercised, a dividend is declared, it goes to the person giving the option.

On the other hand, where a contract of purchase has been entered into, but the delivery of the stock and the payment of the purchase price has been deferred, and, before the contract is executed, a dividend is declared, it goes to the purchaser.

*(3)* The agreement made the basis of this controversy is in the following words and figures:

"This agreement made and entered into by and between V. L. Rogers, S. T. Pease, S. F. Clark, W. R. Smith Vaniz, T. P. Andrews and L. P. Cook, individually and as trustees, parties of the first part, and Charles G. Smith, party of the second part, all of Memphis, Shelby County, Tennessee, witnesseth:

"1.   Parties of the first part have, for the consideration hereinafter recited, agreed to sell and deliver and the party of the second part has agreed to purchase at the price and upon the terms hereinafter mentioned seventeen hundred and eighty-seven and one-half (1787½) shares of the capital common stock of Exchange Building Company, a Tennessee corporation having its principal place of business in Memphis, Tennessee.

"2.   The Exchange Building Company has a total capital common stock of thirty-five hundred (3500)

shares. The sale and purchase of the seventeen hundred eighty-seven and one-half (1787½) shares insures to the purchaser the control of the company.

"3. Parties of the first part shall concurrently with the execution and delivery of this agreement deposit with the Union & Planters Bank & Trust Company of Memphis, subject to the terms hereof, certificates for seventeen hundred eighty-seven and one-half (1787½) shares of the common capital stock of said company properly indorsed in blank, so that the delivery thereof to the purchaser shall vest him with the title and ownership thereof. Parties of the first part shall also procure and deliver to said Union and Planters Bank & Trust Company resignations of each and every one of the present officers and of all the directors of said Exchange Building Company, to be effective upon the consummation of this transaction.

"4. The said Charles G. Smith agrees to pay for each share of said common capital stock two hundred fifty dollars ($250), making a total of four hundred forty-six thousand, eight hundred seventy-five dollars ($446,-875), of which he deposits concurrently with the execution of these presents the sum of twenty-five thousand dollars ($25,000) in cash, the balance to be paid in cash to the Union and Planters Bank & Trust Company for account of first parties on or before June 20, 1925.

"5. If, for any reason, any of the shares deposited in escrow with said bank cannot at the time of consummation be delivered, parties of the first part shall have the right to substitute other shares of said stock of like number for those which cannot be delivered. If the stock cannot be replaced it shall be optional with the buyer

to accept the remaining shares at $250 per share or decline to take any.

"6.   On payment to the said bank of balance of purchase price on or before June 20, 1925, the said bank shall deliver to said second party all certificates for seventeen hundred eighty-seven and one half (1787½) shares of stock, together with the resignations of officers and directors, and pay the proceeds to the parties of the first part.

"7.   If the party of the second part shall fail to pay to the said bank the balance of the consideration on or before June 20, 1925, then the bank shall pay the said twenty-five thousand dollars ($25,000) to the first parties and return to them all certificates of stock together with the resignations of officers and directors of said company, which money so paid shall be retained by the parties of the first part by way of liquidated damages for breach of contract on the part of the second party to consummate said purchase.

"8.   If the party of the second part fulfills the obligation by paying said bank the balance of purchase price on or before June 20, 1925, he shall be entitled to a delivery of the certificates for seventeen hundred eighty-seven and one-half (1787½) shares of stock properly indorsed in blank, together with the resignations of officers and directors, and be entitled to enforce the same by specific performance."

Our conclusions are as follows:

### 1.

The foregoing agreement, by its express provisions, is a contract of sale and not an option to buy. *Fourth Nat. Bank* v. *Stahlman,* 132 Tenn., 367; *Maxwell* v. *Hunt-*

*ingdon Refrigerator Co.,* 120 S. E., 522; *Western Union Telegraph Co.* v. *Brown,* 253 U. S., 101, 64 L. Ed., 803; Fry on Specific Performance (5 Ed.), p. 70; Story's Equity Jurisprudence, vol. 2, p. 28, sec. 715.

### 2.

Said contract is plain and unambiguous. Therefore, the other courts correctly excluded evidence which had a tendency to vary or contradict its terms and meaning.

### 3.

*(4)* The mere fact that the contract provides for liquidated damages does not convert the contract of sale into an option, but, in the absence of a provision to the contrary, merely gives the seller the choice of enforcing his full rights against the purchaser, or claiming the amount stipulated as liquidated damages. *Stewart* v. *Griffith,* 217 U. S., 323, 54 L. Ed., 782; *Western Union Telegraph Co.* v. *Brown, supra;* Fry on Specific Performance, *supra;* Story's Equity Jurisprudence, *supra;* Sedgwick on Damages (9 Ed.), vol. 1, sec. 426, p. 824; Southerland on Damages (4 Ed.), vol. 1, sec. 297, p. 926; *Cincinnati-Louisville Theatre Co.* v. *Masonic Widows and Orphans Infirmary,* 272 Fed., 637; *Dana* v. *St. Paul Investment Co.,* 44 N. W., 55; *Rogers* v. *Lowrance,* 117 Atl., 564; *Eaton* v. *Sadler,* 110 So., 10; *First Trust & Savings Bank of Rockhill* v. *Pruitt* (S. C.), 113 S. E., 469; *Powell* v. *Dwyer* (Mich.), 112 N. W., 499; *Barrett* v. *Wiskus* (Iowa), 196 N. W., 14; *O'Brien* v. *Paulsen* (Iowa), 186 N. W., 440.

### 4.

When there is a binding agreement · to sell corporate stock and a dividend is declared between the time

of making the agreement to sell and the delivery of the certificate, the dividend belongs in equity to the purchaser and not to the seller. *Lafountain & Woolson* v. *Brown* (Vt.), 101 Atl., 36; *Bank of Waverly* v. *Daily* (Neb.), 170 N. W., 183; *Rossi* v. *Rex Consolidated Mining Co.*, 183 Pac., 120; *Saultine* v. *Strand*, C. C. A. 8th Cir., 5 Fed. (2nd), 809; *Curry* v. *White*, 45 N. Y., 822; *Harris* v. *Stevens*, 7 N. H., 454; Black and others, claimants and Homersham, defendant, L. R. 4 Exc. Div., 24, 39 L. T. (N. S.), 671, 48 L. J. Exc. (N. S.), 79; 7 R. C. L., 292.

*(5)* This rule is not opposed by the decision in *Wallin* v *Lumber & Mfg. Co.*, 136 Tenn., 124, holding that where directors at an annual meeting declared and set apart a dividend to the stockholders, to be held in the treasury and paid out at a later date on the order of the board, the declaration of the dividend had the effect to segregate the amount from the corporation's assets, leaving it disassociated from the capital stock, the law implying a promise at the time of its declaration to pay to the then stockholders their proportionate amounts, so that the dividend did not pass as an incident to the stock certificates transferred before the order of the board for its payment, but as between transferor and transferee, remained the property of the transferors.

### 5.

The underlying reason for the rule is that any other rule would operate as a fraud in law upon the purchaser and, therefore, the rule especially applies in this cause where the sellers by their own act sought to strip $35,-750 in value from the thing they sold. *Lafountain & Woolson Co.* v. *Brown, supra; Bank of Waverly* v. *Daily,*

*supra; Harris* v. *Stevens, supra; Black and others, claimants and Homersham, defendant, supra.*

### 6.

The testimony upon which cross complainants, trustees and directors, seek to have said contract reformed is as follows: W. R. Smith Vaniz:

"Q. Did you favor or vote, as a member of this voting trust, in favor of giving Mr. Smith an option on this common stock that was held by this trust? A. Yes, sir."

L. P. Cook:

"Q. 14. Did you participate in any negotiations with Mr. Charles G. Smith with reference,—or rather, leading up to the acquisition of seventeen hundred and eighty-seven and a half shares of stock that were held by the voting trust of which you were a member? A. Not beyond reading the option and signing it.

"Q. 15. State whether, or not, the option given Mr. Smith was a verbal or written option? A. Well, it was verbal in the beginning. I think there was a difference of two or three days,—probably four days between the consummation of the option and the beginning of the request from Mr. Smith.

"Q. 16. Now, what do you mean by the consummation of the option? A. That is when it was signed up, you know."

V. L. Rogers:

"Q. 43. Did you have any knowledge at any time prior to the meeting of June 9, 1925, that anyone aside from Mr. Charles G. Smith held the option that has been referred to? A. I had no knowledge of it."

T. B. Andrews:

"Q. 21. Were you present and participating in any negotiations with Mr. Charles G. Smith looking towards the purchase of the stock held by the voting trust in the Exchange Building Company? A. I was not present at any meeting looking to that, but I was present at a meeting at which Mr. Pease reported to the voting trust that Mr. Smith wanted an option on the stock at two and a half for one. I was present at that meeting, at which meeting we agreed to give Mr. Smith a verbal option on this seventeen hundred and eighty-seven and a half shares at two and a half for one.

"Q. 22. Did the voting trustee give him that verbal option? A. How is that?

"Q. 23. Did the voting trustees give him that verbal option? A. We authorized Mr. Pease to."

S. F. Clark:

"82. Will you please state, in your own way, your recollection and your knowledge in connection with those negotiations? A. Mr. Pease called the directors together and stated that he had a proposition from Mr. Charles G. Smith, and that he proposed to take an option, or give an option on the sale of 1787½ shares which we represented at the price of two and a half for one. Mr. Smith was to deposit twenty-five thousand dollars,—and I believe this came later, however—Mr. Pease went back to Mr. Smith, and then came back to us. We gave him a verbal option to begin with, and then he came back with a written option.

. . . . . .

"104. Was there any particular or special reason in your mind why you favored giving Mr. C. G. Smith an option on this stock held in the pool? A. None, other than Mr. Smith had been connected with the Building

Company ever since it was built, and we felt kindly towards Mr. Smith to that extent, that we would give him a chance to buy the building, if he saw fit.''

S. T. Pease:

''Q. 64. Please state, in your own way, those negotiations, describing what took place. A. Mr. Smith came to me and asked for an option on this stock, or wanted to know if I would advocate or recommend to the board that he be given an option on the building. I told Mr. Smith that we were opposed to options, as a rule, but that I would talk it over with the board. I handled this matter with the voting trustees, and they agreed to give Mr. Smith an option for sixty days for twenty-five thousand dollars, and I so reported to him.

''Q. 65. Was that option ——? A. (Continuing) He then presented to us a few days later a written option, which I submitted to the board, and which they formally accepted.

. . . . . . .

''Q. 101. Did Mr. Thompson at any time, serve any notice on you that the option of Mr. Smith had been assigned to him? A. He did not.''

C. G. Smith testified that he asked Pease for an option on the trust stock on Saturday, and that on Monday morning, ''I saw him and he told me that they had agreed to let me have that option, and I think it was for sixty days, and I would put up $25,000 cash.''

As previously stated, the contract involved was prepared for the parties concerned by Elias Gates, a lawyer of ability and experience in such matters, and it is inconceivable that he would have prepared a contract of sale, thereby binding his client (Smith) for the payment of $446,000, when Smith only intended to involve

himself to the extent of $25,000, which sum he was to pay as a consideration for a sixty-day option to buy. The trustees and Smith carefully scrutinized this paper before signing it. They are intelligent, experienced and successful business men, and, strange to say, not one of them testified that he did not understand this paper, or that the draftsman prepared it otherwise than he was instructed to do. Neither do any of them point out in what respect it varied from the true agreement of the parties.

In our opinion, cross complainants do not bring themselves within the rule announced in *Alexander* v. *Shapard*, 146 Tenn., 90, where it appears that a lawyer was instructed to prepare a deed conveying certain property to a husband and wife by the entireties, and he drafted the instrument so as to convey the property to the husband and wife jointly, advising them that this language constituted them tenants by the entireties.

*(6)* It will be noted from the testimony quoted above that the parties speak of the written instrument in question as an "option," and they now strenuously insist that it is an option. They do not undertake to make any distinction between their verbal agreement and the written agreement, and do not seem to have any definite conception in their own minds as to what an option is. There is no definite testimony of an agreement contrary to that of the written agreement. The bare statement that the agreement was that Smith "was to have an option" carries little force, since the parties refer to the written contract of sale, in its present form, as an option.

"If the parties intended to use the words in the sense which they really convey, if the thought to be expressed was the idea the parties intended to convey, then there is

no mistake of fact, but one only of legal consequences. *Helm* v. *Wright*, 2 Humph., 75. If the instrument is drawn exactly as it was intended, naturally there can be no relief by way of reformation." *Alexander* v. *Shapard, supra.*

Neither of the witnesses testified that the written instrument in question did not express the agreement of the parties. In any event, the Chancellor and the Court of Appeals have concurred in holding that the evidence is not so clear, cogent and convincing as to authorize a reformation, and we do not find the evidence such as would justify us in interfering with the exercise of a discretion concurred in by the other courts, especially since we do not consider such reformation necessary to effectuate justice.

### 7.

We likewise concur with the other courts in holding that the evidence is not sufficient to support the contention of cross complainants that the instrument in question was intended merely as a direction to the Union and Planters Bank & Trust Company, the escrow agent, and was not intended as a contract. The very language of the instrument itself refutes this construction.

### 8.

*(7)* Independently of the pool stock, C. G. Smith, as previously stated, owned and controlled 150 shares of said common stock, which he sold to Thompson and associates on June 4, 1925, and delivered on June 12, 1925, and received the money therefor.

In addition to the contentions made by cross complainants, which we have heretofore disposed of, Smith in-

sists that he is entitled to the dividend of $3,000 on said 150 shares, for the reason that his contract was in parol and unenforceable under the Uniform Sales Act.

In our opinion, that question does not arise in this cause. If it is true that under the act referred to the contract of sale was voidable, it was, nevertheless, a sale, and, under the authorities hereinbefore referred to, the purchaser was entitled to the dividend. The seller saw proper to and did perform the contract, and, for the same reason that the purchasers are entitled to the dividend on the pool stock, we hold that they are entitled to the dividend on Smith's individual stock. The principle involved in the two instances is the same. *Lafountain & Woolson Co.* v. *Brown, supra.*

### 9.

Taking the record in all of its aspects, we cannot escape the conclusion that the parties did not contemplate that, between the date of sale and delivery of these shares of stock, a large dividend would be declared and paid to the sellers, thereby depriving the buyers of a valuable part of their contemplated purchases. After all, the intention of the parties is the controlling factor. 1 Morawitz on Pr. Corp., Sec. 174.

It is not, a sufficient reply to this insistence to say that the complainants learned of this disposition of the cash asset before concluding their purchase, and that if it were a violation of their agreement they were justified in declining to perform the contract. If, as a matter of law, under the facts of this cause, the complainants were entitled to said dividend, then they had a perfect right to complete the purchase and institute a suit to recover the funds which the directors wrongfully diverted.

On the other hand, if they were not entitled to said dividend, a refusal to comply with their contract would have involved them in tedious and expensive litigation. The record in this cause is an unusually large one, in which many nice questions have been raised and presented by counsel with ingenuity and ability. We have only undertaken to briefly refer to the more important matters, and to outline only so much of the cause as we considered necessary as a premise upon which to base our conclusion.

After a thorough consideration, we are of the opinion that the merits of the cause are with the complainants, and that the other courts reached the correct result.

Finding no reversible error in the record, it follows that both petitions for writs of *certiorari* will be denied.