305 F.2d 460
 Byron D. SCOTT and Virginia P. Scott, husband and wife
v.
The UNITED STATES.
Joseph H. GILPIN and Maryon T. Gilpin, husband and wife
v.
The UNITED STATES.
 No. 123-58.
 No. 124-58.
 United States Court of Claims.
 July 18, 1962.
 
 Charles L. Thomas, Tacoma, Wash., for plaintiffs.
 Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.
 DURFEE, Judge.
 
 
 1
 From 1944 through 1949 plaintiffs Gilpin and Scott and a third party, Donald McFadon, made 24 purchases of timberlands in the State of Oregon, involving 25 tracts of timber at a total cost of $146,362.45. No purchases were made after 1949. From 1944 through 1952, in 14 transactions, the parties sold these 25 tracts for a total of $803,255.00. It is only the last two sales in 1952 that are involved in this case. These two 1952 sales included 11 tracts sold for a total price of $454,720.00, with a total gain of $407,851.97. Plaintiffs Gilpin and Scott reported their distributive shares of this gain as long-term capital gain for income tax purposes, and paid their taxes on this basis. The Commissioner of Internal Revenue decided that the gain was ordinary income to plaintiffs, and required them to pay deficiencies accordingly, for refund of which they bring this suit.
 
 
 2
 The initial question is whether the tracts of timberland sold by the parties in 1952 were "capital assets" as defined by statute.
 
 
 3
 The Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 117, provides:
 
 
 4
 § 117. Capital gains and losses.
 
 
 5
 "(a) Definitions. As used in this chapter —
 
 
 6
 "(1) Capital assets. The term `capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include —
 
 
 7
 "(A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."
 
 
 8
 The gain was reported in 1953 and 1954. There was no change in the above definition in the 1954 Code, § 1221, 26 U.S.C. § 1221.
 
 
 9
 Obviously plaintiffs acquired this property for sale but we do not think they acquired or held property "primarily for sale to customers in the ordinary course of his trade or business," as stated in the statute. Among the factors considered in reaching this conclusion are the criteria considered by this court in McConkey v. United States, 131 Ct. Cl. 690, 130 F.Supp. 621 (1955). In deciding that residential lots were not sold in the ordinary course of the trade or business of plaintiffs in that case, the court held that they were entitled to treat these transactions as the sale of capital assets and the profit as capital gain. The court said (at page 692, 130 F.Supp. at page 622):
 
 
 10
 "No one factor, obviously, is determinative of whether or not property is held primarily for sale to customers in the ordinary course of one's trade or business. But, among the factors regarded by the courts as important are the activities of the taxpayer, or his agents, in promoting sales, the extent of the development and improvement of the property, the purpose for which the property was acquired, and the frequency and continuity of sales. * * *"
 
 
 11
 Prior to the agreement in 1944, plaintiffs and McFadon had never been associated in business together. Scott's primary occupation was the practice of law; Gilpin was president of a furniture factory. Both spent a minor part of their time on personal investments in stocks, and a still smaller part of their time on the timberland transactions involved in their agreement with McFadon, who was the manager of the enterprise. He had authority under the agreement to buy, manage and sell timberlands in his own name for the joint enterprise. The parties were to share equally in profits, after paying management expenses and ten percent of the net profits to McFadon as compensation.
 
 
 12
 The parties never engaged in any activity in promoting sales of their timberlands, except for an unsuccessful effort to advertise and sell three of the 25 tracts at public auction in 1947. There was never any other advertising of lands purchased under the agreement. McFadon spent a small percentage of his time in the purchase, management and sale of the timberlands. No timber was ever sold on a stumpage basis. The negotiations for the purchase in 1952 of the tracts involved in this case were initiated by the two buyers, Bullock and the Multnomah Plywood Corporation, without any sales activity by plaintiffs or McFadon. McFadon's activities under the agreement were those of a trustee managing an investment rather than buying and selling timberland in the ordinary course of business of plaintiffs.
 
 
 13
 No effort was made to develop or improve the property.
 
 
 14
 No roads were built to or on these timberlands, and no logging operations were ever conducted thereon by the parties to the agreement.
 
 
 15
 The lands were purchased by the parties through a broker, for the purpose of an investment. Timberlands of this type had been held by their purchasers for ten to twenty years or longer. The price of timber rose so rapidly after the war from 1946 until 1952 that it was possible to sell the timberlands at substantial profit after much shorter holding periods than was anticipated when the tracts were purchased.
 
 
 16
 The tracts sold by plaintiffs to Bullock in 1952 were held by plaintiffs for a period of three years and four months between purchase and sale.
 
 
 17
 In the sale to Multnomah in 1952, the holding period averaged four years and two months, the shortest period being three years and five months. The average holding period for all the tracts purchased between 1944 and 1949 and sold between 1946 and 1952 was 34 months. Timberlands of the type purchased under the agreement between plaintiffs and McFadon were held by their owners for ten to twenty years or longer. However, the rapid rise in the price of timber after World War II made it possible to make profitable disposition of timberlands after shorter holding periods than had been anticipated when the earlier purchases had been made under the agreement. The profit realized from these sales by plaintiffs was not due to any business activity by plaintiffs; it resulted from this rapid rise in the price of timber which had been purchased as a capital asset investment, and not "primarily for sale to customers in the ordinary course of (their) trade or business" as defined in the Internal Revenue Code of 1939, § 117.
 
 
 18
 The absence of any activity by plaintiffs in promoting sales of these timberlands, with one minor and unsuccessful exception; the complete lack of any evidence that plaintiffs had ever tried to develop and improve their timberlands between 1944 and 1952; the infrequent transactions involving an average of less than two sales a year over an eight-year period; and the evidence as to the purpose of the parties in acquiring these timberlands as investments; are factors that considered together, lead us to the same conclusion that this court reached in McConkey v. United States, supra.
 
 
 19
 We therefore conclude that the sales of the timber tracts to Bullock and Multnomah in 1952 by plaintiffs under the terms of their agreement with McFadon constituted sales of capital assets as defined in Sec. 117 and that the profits realized by plaintiffs were capital gains and not ordinary income.
 
 
 20
 Judgment will be entered for plaintiffs with the amount of recovery to be determined pursuant to Rule 38(c), 28 U.S.C.
 
 
 21
 It is so ordered.
 
 
 22
 JONES, Chief Judge, and DAVIS, LARAMORE and WHITAKER, Judges, concur.