UNION BAG–CAMP PAPER CORPORATION

v.

The UNITED STATES.

No. 386–58.

United States Court of Claims.

Dec. 13, 1963.

Paul D. Miller, New York City, for plaintiff. John H. Alexander, William B. Landis, Jr., Joseph E. Bachelder III, and Mudge, Stern, Baldwin & Todd, New York City, were on the brief.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis D. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the briefs.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 45 to Lloyd Fletcher, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed February 25, 1963. Briefs were filed by the parties, exceptions to the commissioner's findings were taken by the defendant, and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover under each of the three causes of action set forth in the petition and defendant is not entitled to the setoff asserted in its first amended answer. The amount of recovery will be determined pursuant to Rule 38(c).

OPINION OF COMMISSIONER

Pursuant to section 1491, title 28 United States Code, plaintiff has brought this suit for a refund of Federal income

taxes, and interest thereon, assessed and collected from the plaintiff by the Commissioner of Internal Revenue for the calendar year 1949. The total of such taxes and interest claimed to be refundable for 1949 aggregates $79,863.95.[1]

Since 1916 the plaintiff has been engaged in the manufacture of paper, paper bags, and related products.[2] For many years plaintiff manufactured its products from kraft pulp and paper purchased from others. However, in 1936 it completed the construction of the first unit of a large integrated pulp mill in Savannah, Georgia, and thereupon for the first time began to manufacture its own kraft pulp. At the same time, plaintiff's management decided that the company should inaugurate a long-range program for acquisition of timberlands through purchase or long-term lease primarily with a view to developing thereon a conservation and forest management program designed to provide plaintiff with successive and continuous crops of pulpwood for current use, and as a reserve for future use, in its manufacturing operations at the Savannah plant. The program was commenced in 1936, and by the end of the taxable year here involved, plaintiff had acquired more than 700,000 acres of land in Georgia, South Carolina, and Florida. Of this 700,000 acres, about 266,000 were held by plaintiff under fourteen long-term leases.[3] The leased lands varied widely in physical characteristics and in the amount of timber growing thereon. Some of the land had been burnt over, some had been used for grazing, some included extensive swamp areas, and some had large open spaces devoid of timber or other forest cover. This relatively large amount of leasing activity by plaintiff, in lieu of outright purchase exclusively, was due both to plaintiff's desire to hold its capital expenditures for land as low as possible while expanding its Savannah mill and, in some instances, to preferences of landowners for annual income from their lands over a long period of years.

The dispute in this case involves only the leased lands. The primary purpose of plaintiff in entering into these long-term leases was to obtain exclusive possession of timberlands which would be necessary for the growing of trees efficiently to provide continuous crops of pulpwood as a raw material supply for its Savannah mill.[4] In addition to timber rights, plaintiff acquired by these leases, with minor reservations, the complete and exclusive use and control of the leased lands "including * * * all timber, logging, wood, turpentine and naval stores, oil, mining, mineral, water, water power, grazing, farming, and hunting rights."[5] Plaintiff also had the right to build and operate roads, railroads, mills, wells, mines, lakes, buildings, and

1. Plaintiff has also filed suits for refund covering the four subsequent taxable years, 1950–1953, inclusive, which suits bear Court of Claims Numbers 193–61, 295–61, 296–61, and 398–61, respectively. The basic issues involved in those cases are the same as those involved herein, and by agreement of counsel with the Commissioner's approval, further action in the later cases is being held in abeyance pending final disposition of the present case.

2. In 1956, Union Bag & Paper Corporation was merged into plaintiff whose name was thereupon changed from Camp Manufacturing Company, Incorporated, to Union Bag-Camp Paper Corporation. Plaintiff has thus succeeded to all rights of Union Bag & Paper Corporation to the claims asserted herein. With respect to all events occurring prior to 1956, the term "plaintiff" is herein used to refer to Union Bag & Paper Corporation.

3. Ten of these leases were for terms of 99 years, two were for terms of 66 years, and two were for terms of 40 years. Twelve of the leases were of lands in Georgia, and the other two were of lands located in Florida and South Carolina, respectively.

4. The parties have stipulated that all of the leased lands were used by plaintiff in carrying on its trade or business.

5. The quoted material is taken from one of the earliest of the leases, known as the Miller No. 1 lease. The parties have agreed that this lease is typical of ten of the fourteen leases, and it is the subject of detailed description in finding 8, infra.

other structures and to remove such property from the lands at the end of the leases. Further, plaintiff had the complete right of assignment and sublease, and, in ten of the leases, had an option to purchase fee simple ownership at an agreed value. In short, it may be said that, for all practical purposes, the owner-lessors by these leases conveyed to plaintiff for the agreed term their entire possessory rights in the real estate, subject to certain restrictions on the cutting of timber described below.

In return, plaintiff agreed to pay all taxes assessed against the leased properties, to pay annually into a forestry management fund five cents per acre (under some of the leases ten cents per acre) to be expended for fire protection and forest management, and to pay annually to the lessor "as rental" an amount equal to five percent of an agreed and specified value [6] of the leased lands. With respect to the cutting of timber, in most of the leases, plaintiff agreed (with immaterial exceptions) not to cut or remove any timber during the first seven years of the term and that thereafter the right to timber cutting or removal would be restricted to the estimated annual growth in any year, such right, however, to be cumulative. This annual growth rate was set at one-half cord of pulpwood per acre with provision for adjustment thereof at five-year intervals if actual growth materially differed from the assumed rate, and, under the cumulative provision, if plaintiff did not cut the full amount of annual growth in any given year, it was entitled to carry forward the balance for cutting to any later year. Thus, by these provisions the lessors were afforded (during the first seven years of nine leases) the security of

standing timber on the lands, plus the assurance that, since only the annual growth could be cut thereafter, the lands would probably be returned to them with more standing timber thereon than existed at the inception of the leases.

Despite the foregoing, plaintiff was given in nine of the leases a right to cut additional timber but only upon the payment of a stipulated price therefor.[7] In a lease known as "Ray-Bond," plaintiff also acquired for no additional consideration the right to cut during each of the first seven years $65,000 worth of saw timber, defined as trees measuring 12 inches in diameter one foot above the ground.[8]

The four remaining leases, known as the Samwilka-Morgan and Douglas-Dickerson leases, are quite similar to the ten leases described above, except that these four leases grant no purchase option to plaintiff and contain different provisions relating to cutting rights. Under the Samwilka-Morgan leases, plaintiff obtained the right at any time during their 40-year term to cut trees having a diameter of 5.1 inches or more, breast high, with a covenant that at the end of the leases there would be a minimum of the same quantity of merchantable timber of such size on the lands as was there at the beginning of the leases. Under the Douglas-Dickerson leases, plaintiff purchased outright for a specified sum all trees then on the lands measuring six inches or more in diameter one foot above the ground, and thereafter, plaintiff had the right to cut all trees attaining such diameter during the lease term of 66 years. This purchase was made by a separate payment of an amount in addition to the regular payments called for

---

6. This value was also the amount for which, in some of the leases, plaintiff was given the option to purchase the fee simple ownership in the lands.

7. Pursuant to this provision, plaintiff purchased and paid for an aggregate of $188,164 of timber prior to the end of 1949. In each such case, plaintiff treated the amount so paid as the cost of purchased timber on its books and in its income tax returns. In four of these leases, additional amounts so paid reduced the purchase-option price, which had the effect also of reducing the annual payments based on a percentage of that price.

8. In one paragraph this lease also refers to the fixed payments for the first seven years as "anticipated and estimated depletion payments."

under the lease, and this separate payment was not deducted from ordinary income but was treated as cost of timber in plaintiff's income tax returns.

During 1949 plaintiff purchased approximately 85 percent of its pulpwood requirements from others and cut only 15 percent from the lands owned or leased by it. Primarily, the plaintiff has always operated both its own timberlands and those leased by it as so-called "tree farms".[9] The objective of such an operation was to produce by scientific methods successive and continuing crops of pulpwood and timber. This involved the expenditure of substantial sums for protection of timber growing, and to be grown, from fire and other hazards, selective cutting and thinning of wooded areas, encouragement of natural reseeding, and artificial reforestation by planting of pine seedlings.[10]

In addition to its primary operation of the leased lands as pulpwood tree farms to serve as a source of raw material supply for its paper mill, plaintiff used the lands, as it had a right to do, for other income producing purposes. For example, it sold saw timber to lumber companies, granted turpentine leases, obtained oil and mineral rentals, and the like. Thus, in 1949, plaintiff realized from the leased lands $166,993.47 for which it made no payment to the lessors except the specified annual payments required by the leases. This sum was derived from the following sources:

(a) $59,697.11 was the fair market value of timber cut for use as pulpwood in plaintiff's Savannah mill, and was reported in plaintiff's 1949 return as giving rise to capital gain under section 117 (k) (1) of the Internal Revenue Code of 1939 (hereinafter referred to as the "1939 Code");

(b) $66,941.74 was derived from the sale of saw timber to lumber companies and dealers under cutting contracts, and was reported in plaintiff's 1949 return as giving rise to capital gain under section 117(k) (2) of the 1939 Code; and

(c) $40,354.62 was derived from miscellaneous uses of the leased lands, including oil and mineral rentals, turpentine leases, salvage, etc., which sum, representing over 24 percent of plaintiff's 1949 gross income from the leased lands, was reported as ordinary income.

During 1949, pursuant to the above described 14 leases, plaintiff made annual payments to the lessors in the aggregate amount of $147,864.47; it expended for forest management and fire protection on the leased lands $12,923.67; and, in addition, it incurred or accrued and paid an aggregate of $38,626.90 in respect of *ad valorem* property taxes on the leased lands. In its 1949 income tax return, plaintiff deducted these amounts totalling $199,415.04 as ordinary and necessary business expenses under section 23(a) (1) (A) of the 1939 Code. However, upon audit, the Commissioner of Internal Revenue refused to allow the deductions so claimed and adjusted plaintiff's return so as to capitalize these amounts as part of the cost of timber to be recovered through depletion allowances only. This action by the Commissioner resulted in an assessment of additional tax for 1949 of $56,695.12. The Commissioner further adjusted plaintiff's 1949 tax return by disallowing five percent of its total general expenses for land management on the ground that such five percent of management expense was properly attributable to the cost of entering into and supervising certain cutting contracts (referred to under (b) above) and should be charged against the

---

9. During the period 1950–1953, all these lands were designated as "certified tree farms" by various forestry commissions and organizations located in Georgia, South Carolina, and Florida.

10. Although plaintiff first established its own tree nursery in 1937 and had done some amount of artificial planting in the taxable year involved, it did not commence artificial reforestation on a large scale until the planting season, 1953–1954.

gain realized by plaintiff from such contracts. This latter adjustment resulted in assessment of further additional income tax for 1949 in the amount of $2,369.86 for a total of additional 1949 taxes amounting to $59,064.98. This amount, plus interest of $20,798.97, was paid by plaintiff, and thereafter a timely claim for refund thereof was filed. Upon the expiration of more than six months from the filing of the claim, and no formal action thereon having been taken by the Commissioner, this suit was filed seeking judgment for such additional taxes and interest.

### (a) The first issue

From the foregoing, it is apparent that the major question which the court is here being asked to decide involves a determination as to the true character of the expenses incurred and paid by plaintiff under the above described long-term leases. In plaintiff's view of the case, its annual payments of what the leases refer to as "rental", the *ad valorem* taxes on the leased lands, and the forest management fund expenditures all fall within the provisions of section 23(a)(1) (A) of the 1939 Code which allow the deduction from income of:

"* * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * *rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property* to which the taxpayer has not taken or is not taking title or in which he has no equity." [Italics supplied.]

Defendant, on the other hand, contends that all of the aforesaid expenses should be capitalized as part of the cost of timber and offset against any income realized when the timber is cut. The importance to the parties of the issue thus posed is this. During the taxable year involved, plaintiff realized income from two sources upon the cutting of timber standing on the leased lands. (See finding, 20 *infra*.) First, it cut pulpwood for its own use, and having so elected, it reported the fair market value of such timber as capital gain under section 117 (k) (1) of the 1939 Code.[11] Secondly, plaintiff entered into certain timber cutting contracts with others, and it reported the amounts received by it from those contracts as capital gain under section 117(k) (2) of the 1939 Code.[12] If plaintiff's payments under the leases must be capitalized and added to its timber depletion basis (as contended for by defendant), they serve merely to diminish plaintiff's capital gain. On the other hand, if (as contended for by plaintiff) the payments are properly deductible as rent, then plaintiff has procured a deduction offsetting its ordinary income in exchange merely for an increase in lower-taxed capital gain.

---

11. The pertinent provisions of this section read as follows:

"If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. In case such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. * * * "

12. The pertinent provisions of this section read as follows:

"In the case of the disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * * the difference between the amount received for such timber * * * and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber * * *."

Viewed from the standpoint of a *lessee* under the type of long-term lease here involved, this precise question does not appear to have been the subject of any reported decision. The other side of the coin, that is, the proper tax treatment of such payments in the hands of the *lessor* has been the subject of decision by the Tax Court of the United States. In Estate of James M. Lawton, 33 T.C. 47 (1959), the taxpayer was the owner of certain timberlands in Georgia which he leased for a term of 66 years to the plaintiff's predecessor herein, Union Bag & Paper Corporation. Although not identical to the leases here involved, the Lawton lease was quite similar to them. It granted, leased and demised Lawton's timberlands to Union Bag, the latter to have "complete and exclusive use and control" of the land for 66 years, including the right to cut and remove trees of a specified size up to a stated cumulative maximum number of cords per year. In addition, as in the present leases, Union Bag was granted turpentine, water, farming, and other rights, including the right to construct roads, wells, mines, buildings, and other structures on the land. Union Bag was also given a one-half interest in oil, gas, and mineral rights. Similarly to its undertakings in the present leases, Union Bag agreed to pay for these rights by paying all taxes assessed against the land, to furnish adequate forest management and fire protection, and to pay the lessor a fixed annual sum "as rental." [13] The taxpayer-lessor contended that the annual payments thus received from Union Bag were entitled to capital gains treatment because the lease contemplated essentially the "purchase and sale of timber-cutting rights." Pointing to the much broader terms of the lease, the Government responded that the lease contemplated Union Bag's use of the lands for "timber farming" as opposed to a disposal of timber, and that, therefore, the annual payments were

merely rent taxable to the lessor as ordinary income.

In sustaining the Government's position, the Tax Court held at 33 T.C. 54 that capital gain treatment under section 117(k) (2) was not applicable to the lessor's receipts because:

" * * * Rent was to be paid each year regardless whether or not any of the timber involved was cut or removed from petitioner's acreage. As the agreement is explicit in this respect, we think it clear that petitioners have not, in any sense of the term, retained the necessary economic interest in the timber which would entitle them to capital gains treatment pursuant to section 117 (k) (2). * * *"

The court further rejected the lessor's contention that the contract of lease was essentially a "sale of timber-cutting rights" and stated at 33 T.C. 56:

"Viewing the contract in its entirety, in our opinion the payment of $1.75 per acre by Union Bag was in the nature of rent for the right to use and occupy petitioner's acreage for "pine-tree farming" and other independent forestry activities, including the right to cut and remove a cumulative maximum of 2,100 cords per annum of pulpwood during the term of the agreement."

To the same effect, in a case involving the Georgia state income tax law, see Superior Pine Products Company v. Williams, 214 Ga. 485, 106 S.E.2d 6 (1958).

Having thus succeeded before the Tax Court in its contention that the type of payments involved herein are "rent" in the hands of the lessor, the Government with considerable agility here contends that, on the lessee's side, these payments are not "rent" at all but are actually the purchase price of a right to cut timber and hence should be treated as capital

---

13. In further resemblance to some leases here involved, the Lawton lease also gave Union Bag the right to cut additional amounts of timber for a specified price per acre. Like the present case also, the payments for such specific cutting rights were admittedly for purchase of timber and were not at issue in the case.

expenditures.[14] Essentially, the defendant finds justification for this 180-degree shift of position in section 1.631–2(e) (1) of the Treasury Regulations promulgated under the Internal Revenue Code of 1954.[15] That section of the regulations reads:

> "Amounts paid by the lessee for timber or the acquisition of timber cutting rights, whether designated as such or as rental, royalty, or bonus, shall be treated as the cost of timber and constitute part of the lessee's depletable basis of the timber, irrespective of the treatment accorded such payments in the hands of the lessor."

Defendant correctly points out that, insofar as the issues in this case are concerned, the 1954 Code provisions are the same as those contained in the 1939 Code. Cf. section 117(k), 1939 Code and section 631, 1954 Code. Therefore, defendant urges the applicability here of the above-quoted regulation despite its promulgation some years after the taxable year involved in this case. The question thus raised may properly be passed without decision, for even if the regulation had been promulgated in 1949, its provisions do not cover the facts established by the record herein.

Obviously, there may be numerous instances in the timber industry where the contract between the buyer of timber and the landowner is denominated by them a "lease" and where the buyer agrees to pay the landowner sums designated in the contract as "rentals." Nonetheless, if it appears upon examination of the contract that all the "lessee" has acquired thereunder is the "lessor's" timber or the right to cut it, then the regulation by its terms is applicable, and the "rentals" are properly treated as the cost of timber to the "lessee."

However, in insisting upon the applicability of the regulation to this case, defendant appears to have overlooked the fact that, under the long-term leases here involved, the plaintiff acquired much more than timber or the right to cut it. While on this record there can be no doubt that plaintiff's major objective in acquiring woodlands, both by purchase and lease, was to assure itself a continuous supply of pulpwood from both existing and after-born timber, it is unrealistic to infer therefrom that these leases must be viewed in the same light as simple timber-cutting contracts. For all practical purposes,[16] plaintiff obtained for the long terms of these leases the exclusive use, control, and enjoyment of all the possessory rights attaching to the real estate. It can hardly be denied that the consideration paid by a person to acquire such rights in real estate for a term of years is traditionally and properly known as "rent." This becomes all the more obvious when it is realized that all timber standing on the leased lands could be destroyed by catastrophic fire or disease infestation, and nonetheless plaintiff's obligation to pay the stipulated annual payments would remain unimpaired. This exception to the contract doctrine of "commercial frustration" is apparently unique to the obligation of a tenant to pay rent under a lease of real property. See Wood v. Bartolino, 48 N. M. 175, 146 P.2d 883 (1944).

In the light of the foregoing, coupled with the consistent use by the parties of the language of lease through-

14. One is reminded of Humpty Dumpty's rather unique use of words:
"When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less." Carroll, Through the Looking Glass, Dial Press Ed. p. 238.

15. As defendant observes in its brief the 1939 Code and Regulations for 1949 are not very enlightening on the question of what is to be capitalized as cost of timber.

16. It has, of course, become axiomatic that taxation is an "intensely practical matter." See, for example, Farmers Loan & Trust Co. v. Minn., 280 U.S. 204, 212, 50 S.Ct. 98, 74 L.Ed. 371; and Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383.

out the documents in question,[17] it is hardly surprising that in Lawton the Tax Court held the same type of payments as are involved herein to be "rent." No persuasive reason has been assigned why this court should disagree with the well-reasoned opinion of the Tax Court in the Lawton case, and we are told by the Supreme Court of the United States that, if payments made under a lease are "rent" in the hands of one of the parties, those same payments should be considered "rent" in the hands of the other party. Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946). There the Court considered the character of certain payments made under an oil lease, and, speaking through Mr. Justice Reed, stated at 328 U.S. page 27, 66 S.Ct. page 863, 90 L.Ed. 1062:

> "A decision on the category of expenditures to which these 50% disbursements belong affects both the operators who make them and the owners, lessors, vendors, grantors, however they may be classed, who receive them. If they are capital investments to one, they are capital sales to the other. If they are rents or royalties paid out to one, they are rents or royalties received by the other." [18]

The Government maintains, however, that if plaintiff's annual payments are to be treated solely as rent for use of the leased lands, then there results the "unrealistic position" that the right most important to plaintiff, i. e., the right to cut timber, has been obtained by it "for nothing." At the very least, so the argument goes, the plaintiff should be held to the burden of showing what portion, if any, of plaintiff's annual payments were made for rights *other* than the right to cut timber so that allocation or apportionment of the payments between rental and capital expenditure can be made. This approach was developed in two recent revenue rulings setting forth Departmental refinements of the Lawton principle. Rev.Ruls. 62–81 and 62–82, 1962–23 Int.Rev.Bull. pp. 5, 8. There consideration was given to the proper treatment of annual payments received by *lessors* under long-term leases of timberlands bearing a partial resemblance to the present leases. On the problem of allocation, Revenue Ruling 62–82 states the following:

> "The question remains whether any portion of the lump-sum payment under the instant contract is consideration for a transfer of property in a transaction amounting to a present sale of timber. The transaction could properly be such only if some portion of the consideration was paid for timber having, at the time of the execution of the contract, a determinable fair market value (merchantable timber of cutting size and smaller young growth of appraisable value). Timber that is not in existence at the time of the contract cannot be the subject of a present sale. See Williston on Sales (Rev'd Ed.), sections 62 and 258.

> The rights and privileges conferred upon the paper company comprehended both the possession of land and the disposition of timber. There is no provision of the contract which relates any portion of the payment specifically to timber. Despite the

---

17. Obviously, the substance of a transaction should not depend entirely upon the use of "talismanic words." Flournoy v. Wiener, 321 U.S. 253, 264, 64 S.Ct. 548, 88 L.Ed. 708 (dissenting opinion), or upon the "subtleties of draftmanship," Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 267, 78 S.Ct. 691, 2 L.Ed.2d 743. But where the indications of substance may be ambivalent, the terminology used can be an important indication of the true intent of the parties. Estate of James M.

Lawton, supra, at 33 T.C. pp. 55–56. To the same effect, see Gilmore v. United States, 180 F.Supp. 354, 149 Ct.Cl. 54, 63.

18. As Mr. Randolph Paul has observed, in matters of taxation, there should always be " * * * an understanding of the principle that there are few rules of Federal tax law and few interpretations of the tax statutes that do not cut both ways * * *." Paul, Studies in Federal Taxation, Callaghan & Co., 1937, p. 64.

absence of such a reference, however, some portion of the payment received by the landowner may, in fact, be attributable to timber. This would be true if the timber existing on the tract at the execution of the contract possessed a determinable fair market value. If the taxpayer establishes the fair market value of such existing timber, the payment to the extent of such fair market value constitutes proceeds from the sale of timber. The portion of the payment in excess of the values so established is in the nature of consideration for the use of land over a period of time and, therefore, ordinary income.

However sensible the foregoing allocation principle might be when applied to some types of timber leases, it should not be applied under leases where, as here, the lessee has undertaken to return the leased lands to the lessor with as much, or more, timber standing thereon as existed at the beginning of the leases. In the long run, under these leases, no such thing as timber depletion has occurred, or will occur, on these timberlands,[19] except with respect to some cutting of certain timber at a specified additional cost which transactions are not in dispute here. (See footnotes 7 and 13, supra.) It is true that, due to the aging requirements for suitable timber (see findings 15 and 19, infra), it is inevitable under these leases that during the earlier years of their terms (including the taxable year here involved), trees will be cut which were standing on the lands prior to the execution of the leases. Under such conditions, it has been sug-

gested that the lessee is, in effect, "borrowing * * * timber under an agreement to replace it later." LeFevre, Tax Aspects of Timber Transactions, 18 N. Y.U.Inst. on Federal Taxation 577, 597 (1960). Whatever words are used to describe the transactions in question, the inescapable fact remains that plaintiff's annual payments are made to acquire the exclusive use, possession, and enjoyment of the leased lands, including as a part of those possessory rights, the right to cultivate and cut the annual timber growth. Apportionment of a lessee's land use payments would seem entirely proper in case of a lease, for example, of 1,000 acres of timberland granting the lessee (1) the right to cut the timber from 500 acres with no obligation to replace it and (2) the right to conduct a turpentine operation on the remainder. But, under the present leases, it does not appear that timber depletion will occur, as such, and thus there is nothing logically to allocate or apportion thereto.[20] Looking at the forest instead of the trees, the only ultimate change contemplated for these timberlands is one of improvement to the timber stand, not depletion thereof.[21]

It follows that all three types of payments required to be made by plaintiff should be deemed to constitute "rentals or other payments required to be made as a condition to the * * * use or possession * * * of property." and should therefore be deductible from gross income in their entirety under section 23 (a) (1) (A) of the 1939 Code.

### (b) The second issue

By way of an alternative defense, the Government asserts that if plaintiff is en-

---

19. Plaintiff has accurately observed that the lease provisions for modern and scientific forest management of the leased properties and for the withholding of timber cutting during the first seven years of most of the leases are provisions which are calculated to improve, rather than deplete, the properties, not only for the present benefit of the lessee but also for the eventual benefit of the lessors, or their heirs-at-law and devisees.

20. In a case not involving restriction of cutting rights to annual growth or re-

quiring replacement, it might well be feasible to develop an allocation formula allowing for market fluctuation and based upon expert testimony as to the value of timber cutting rights for the taxable year (i.e. fair market value of the cords of wood allowed to be cut) and as to the market value of all other land use rights.

21. "* * * depletion is based upon the concept of the exhaustion of a natural resource * * *." Mertens, Law of Federal Income Taxation, Vol. 4, Section 24.02.

titled to deduct the above described payments, then it must obviously be a mere lessee of timberlands; as such lessee, it is contended that plaintiff cannot qualify as an "owner" of timber so as to be entitled under section 117(k) (2) to capital gain treatment of sums realized under timber cutting contracts. As previously stated, plaintiff's 1949 income from the leased lands was derived from (1) miscellaneous uses yielding $40,354.62 and reported as ordinary income, (2) the cutting of pulpwood for plaintiff's own use yielding $59,697.11 in fair market value reported as capital gain under section 117(k) (1), and (3) the sale of saw timber under cutting contracts with others yielding $66,941.74 also reported by plaintiff as capital gain but under section 117(k) (2). Only the last mentioned income source is at issue in defendant's alternative defense.

The pertinent provisions of section 117 (k) (2) quoted in footnote 12, supra, disclose that to be entitled to its benefits, the taxpayer must show (1) a "disposal of timber," (2) held for more than six months, (3) by himself as "owner thereof," (4) under any form of contract by which he retains as owner an "economic interest in such timber." Defendant's argument that plaintiff, as lessee, cannot also be the "owner" of the timber on the leased lands results in the unacceptable conclusion that there existed no "owner" of that timber at the time of its "disposal" by plaintiff.[22]

Once again, defendant has charted a course of argument diametrically opposed to that which it pursued so successfully in the Lawton case. Essential to one part of the Tax Court's decision in Lawton was its agreement with the Government's position that the *lessor* was not entitled to the benefits of section 117(k) (2) "because no economic interest in the

timber was retained" by him. 33 T.C. 57. If this be so, the question immediately arises—what happened to the economic interest in the timber? The answer seems clear enough. It had vested in the lessee.

The answer is the same in the present case with the added refinement that plaintiff's rights to cut, use, and remove the timber were restricted (with exceptions not here involved) to the estimated annual growth, a restriction which admittedly was not exceeded by plaintiff.[23] See finding 19, *infra*. Although, as previously held, the annual payments made by plaintiff were in the nature of rentals for the use of land rather than capital expenditures, they also entitled plaintiff, as lessee, to cut, remove, and dispose of the annual growth of timber. *As to such annual growth,* plaintiff acquired the entire proprietary interest and was the owner thereof both legally and equitably, and it is stipulated that plaintiff disposed of no more than that annual growth. Its ownership rights to the *annual* timber crop were as complete as those of any tenant to crops grown by him on leased lands.

■ Accordingly, for purposes of section 117(k) (2), plaintiff was the "owner" of the saw timber disposed of to third parties under cutting contracts. See Boeing v. United States, 98 F.Supp. 581, 121 Ct.Cl. 9 (1951); Giustina v. United States, 190 F.Supp. 303 (D.C., Ore., 1960); L. D. Wilson, 26 T.C. 474 (1956); Springfield Plywood Corporation, 15 T.C. 697 (1950); and Estate of James M. Lawton, supra. Furthermore, it is clear that plaintiff retained the required "economic interest" since the payments under the cutting contracts were based upon actual units of timber cut and were payable only as timber was cut. See Boeing v. United States, supra,

22. The purchasers who paid plaintiff nearly $67,000 for this saw timber would no doubt be startled by such a suggestion.

23. The parties have stipulated that plaintiff paid the lessors $19,686.87 under provisions of the leases permitting the cut-

ting of timber in excess of the estimated annual growth. This amount was treated by plaintiff as cost of timber sold and deducted from the gain realized. See finding 21, infra. Accordingly, it is not at issue here.

and L. D. Wilson, supra. Except for sales from the Ray-Bond tract aggregating $5,868.25, the timber so sold was held by plaintiff for more than six months prior to its disposal.[24] Having thus met all the statutory requirements, plaintiff was entitled to treat the proceeds from these cutting contracts (except for $5,868.25 of the Ray-Bond receipts) as capital gains under section 117(k) (2).

### (c) The third issue

The final issue presented in this case also arises out of plaintiff's business activities in the selling of timber under cutting contracts with others. From all its cutting contracts, both on its own lands and on the leased lands, plaintiff realized gross proceeds during 1949 of $364,592.84.[25]

During 1949 plaintiff incurred and deducted from income under section 23(a), supra, its total expenses of managing all such lands in the aggregate amount of $385,387.23. These land management expenses were composed for the most part of salaries, depreciation, supplies, repairs, travel, entertainment and insurance as detailed in finding 27, *infra*. Plaintiff allocated no part of these management expenses to the negotiation and supervision of its cutting contracts. On the original audit of plaintiff's 1949 return, the revenue agent concluded that no allocation of these expenses was required. On final audit, however, the Commissioner of Internal Revenue adopted a recommendation of his Engineering and Valuation Section to the effect that

five percent of total receipts from the cutting contracts was a "suggestive estimate" of that part of management expense properly attributable to negotiation and supervision of the cutting contracts. The Commissioner thereupon disallowed $18,229.64 (5 percent of $364,592.84) from management expense and instead treated it as direct selling expense offsetting gain realized under the cutting contracts. This action resulted in the assessment of additional income tax for 1949 of $2,369.86 and interest thereon of $834.52.

The record shows that during 1949 plaintiff's employees did spend a small part of their time negotiating sales prices for cutting contracts, designating areas to be cut, marking certain trees to be left standing, making casual checks as to quantities of timber cut, and occasionally inspecting the areas involved after cutting had been completed. (Finding 26, infra.) The record further shows, however, that the foregoing activities were only incidental to overall forest management activities, and that, even the complete elimination of the contract activities would have affected total management expenses merely in nominal amounts. Nonetheless, defendant contends that under Towanda Textiles, Inc. v. United States, 180 F.Supp. 373, 149 Ct.Cl. 123 (1960) and Rev.Rul. 58–266, 1958–1 C.B. 520, some portion of the management expense must have been selling expense directly attributable to the entering into and supervising of the cut-

---

24. In its brief, defendant argues that, in any event, the *entire* gain from the Ray-Bond cutting contract (see finding 20, infra) should be taxed as ordinary income because of failure to comply with the six-month holding requirement of section 117 (k) (2). This argument appears to be based upon the fact that both the lease and the cutting contract contain the same effective date, namely, October 1, 1948, so that, under the doctrine of Springfield Plywood Corporation, supra, the timber "disposal" occurred on the same day as its acquisition by plaintiff. Not only does this argument run counter to paragraph 17 of the stipulation filed herein, but it ignores significant and distinguishing dif-

ferences between the Ray-Bond cutting contract and the contract involved in Springfield Plywood, e.g., unlike the Springfield Plywood contract, plaintiff reserved in the Ray-Bond contract the right to designate the trees to be cut and the areas for logging operations. Except for the first three months of 1949 during which it received a total of $5,868.25, plaintiff had held the Ray-Bond timber for more than six months prior to disposal. Finding 20, infra.

25. This figure includes the $66,941.74 derived from leased land cutting contracts discussed above.

ting contracts and therefore should be offset from the gain realized under those contracts rather than deducted from ordinary income. In support of its estimate that such selling expense amounted to five percent of the total cutting contract receipts, defendant merely asserts that the Commissioner's determination in this regard must be accepted absent proof to the contrary by the taxpayer. However, as stated above, the record before this court is persuasive that the contract activities of plaintiff's employees were only incidental to their forest management duties and at best had but nominal effect on plaintiff's payroll and other management expenses. In no sense do the expenses at issue here resemble the direct and substantial expenses involved in Towanda Textiles, Inc., where this court, in considering an entirely different Code provision, required attorney and adjuster fees directly incurred in the collection of fire insurance on a burned-out plant to be offset against the unrecognized gain accruing from the insurance proceeds. Neither do the expenses here resemble those involved in Rev.Rul. 58–266, supra, which were direct, substantial, and closely related to the coal disposal activities under consideration.[26]

Defendant insists, however, that considering the relatively large amount of gross receipts ($364,592.84), the number of cutting contracts involved (eight on leased lands alone), and the fact that plaintiff's witness (who testified to the insubstantial nature of the selling expenses) was primarily concerned during the particular taxable year with land ac-

quisition for plaintiff rather than with its cutting contracts, there can be little question of the reasonableness of the Commissioner's five percent estimate. Assuming, *arguendo*, the validity of these assertions, defendant has not come to grips with the essential question of whether, *in any event*, the proceeds from plaintiff's cutting contracts must be offset by its selling expenses attributable to the negotiation and supervision of those contracts.

The history of the tax law in this area shows with reasonable clarity that selling expenses, such as those involved here, are properly deductible from gross income and are not required to be restricted to an offset against contract proceeds. There can be little doubt that, prior to 1944, a taxpayer *engaged in the business of buying and selling of timber* (such as plaintiff) was required to report the proceeds from timber sales as ordinary income and was entitled to deduct all ordinary and necessary expense attributable to such sales under section 23(a) of the 1939 Code.[27] The tax treatment is the same today with respect to *outright* sales by owners holding their timber primarily for sale to customers in the ordinary course of trade or business. See Scott v. United States, Ct.Cl., 305 F.2d 460, where, however, on the facts presented, the court decided that the taxpayers were not timber dealers but were investors whose timber sales constituted sales of capital assets as defined in section 117(a) of the 1939 Code. (Section 1221, 1954 Code.)

26. In this connection, the defendant also relies on this court's recent decision in Allied Chemical Corporation v. United States, 305 F.2d 433 (Ct. Cl. No. 347–56, decided July 18, 1962). There the court held that attorneys' fees paid by taxpayer were deductible as ordinary and necessary business expenses, although the legal services had been rendered in connection with a transaction which ultimately resulted in a capital gain to the taxpayer. Because, however, the legal expenses were incurred in the "taxpayer's business of conserving its holdings, and not for the primary purpose of realizing a capital

gain" (Slip op. pp. 9–10), the court allowed the deduction. It is equally true here that plaintiff's forest management expenses were incurred primarily in the ordinary conduct of its business, and the record discloses no recognizable part of such expenses to be directly related to timber sales under cutting contracts.

27. See Williams, Trends in Forest Taxation, 14 Nat'l Jour. 113, 130–131 (June 1961) and Rowen, Taxation of Income from Timber Properties, 33 Taxes 336, 337.

When sections 117(k) (1) and (2) were added to the 1939 Code by the Revenue Act of 1943 (58 Stat. 46), all timber owners, including dealers, became entitled to capital gains treatment where they either cut timber for use in their business (section 117(k) (1)) or sold it to others but with a retained economic interest (section 117(k) (2)). See Williams, Trends in Forest Taxation, 14 Nat'l Tax Jour. 113, 132–133 (June 1961). These statutory provisions, designed by Congress "to afford relief to timber owners," (Boeing v. United States, supra, at page 584 of 98 F.Supp. at p. 25 of 121 Ct.Cl.) contain nothing which on any normal reading would prohibit the deduction by a timber dealer from income of his ordinary and necessary expenses incurred in the growing or selling of his timber, or which would require him to offset such expenses against capital gains realized on timber sales or disposals.

This Congressional omission is highly significant for two reasons. In the first place, in other situations when Congress has desired to restrict a relief provision by disallowing deduction of related expenses, it has done so by express language. Thus, when section 117(j) (3) of the 1939 Code was added by the Revenue Act of 1951, in order to provide for the realization of capital gain on the sale of a growing crop together with the land on which it is situated, section 24(f) was simultaneously added to prohibit the deduction of the expenses of growing such crop. In the second place, during its consideration of legislation which ultimately became the 1954 Code, the House of Representatives passed a provision which would have specifically denied a deduction for the type of expenses here involved. Sec. 272, H.R. 8300, 83d Cong., 2d Sess.; see also H.Rept.No.1337, 83d Cong., 2d Sess., pages A67–A68. However, the Senate Finance Committee eliminated this provision with respect to timber, and the Senate's action was accepted by the Conference Committee. S. Rept.No.1622, 83d Cong., 2d Sess., p. 229

(1954); H.Rept.No.2543, 83d Cong., 2d Sess., p. 33 (1954).

The decisions in this area are equally indicative of the soundness of plaintiff's claim for deduction of the expenses involved. This court considered a related issue in Hirshon v. United States, 116 F.Supp. 135, 126 Ct.Cl. 587 (1953) where the question was whether a trader in securities could deduct stamp taxes paid by him on each sale of stock, or whether, as required by an income tax ruling, he must merely offset such stamp tax cost against the selling price of the stock. Pointing to a checkered history of varying administrative actions (cf. Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52), the court allowed deductions of the taxes as an ordinary and necessary business expense under section 23(a), despite their direct connection to capital gain transactions. Had there been a "Treasury Regulation of long standing which had survived several amendments and reenactments of the income tax law" such as was involved in Winmill, supra, the court indicated it would be required to support the regulation. But "no such situation" existed in Hirshon.

*A fortiori*, in the area of the present dispute, no long-standing regulation, or even a fluctuating one, has prohibited the deductions sought. Instead, with respect to the question here involved, the applicable regulations have been entirely silent and have merely repeated the language of the parent statute, section 117(k) (2). See Treas.Reg. 111, sec. 29.117–8(b) and Treas.Reg. 118, sec. 39.117(k) (1) (b). It was not until 1958, when Rev.Rul. 58–266, supra, was issued that administration action in this field was taken. Meanwhile, as pointed out above, in its deliberations on the 1954 Code, Congress had considered and rejected proposed legislation prohibiting the deduction of the type of expenditures here at issue. From the foregoing, it is clear that plaintiff should not be required to offset against cutting contract proceeds any part of its forest management expense even if it be assumed that, as a

practical matter, some portion thereof could be singled out as selling expense.[28] See Drey v. United States (D.C.Mo., 1960) 61–1 USTC para. 9116.

Finally, it is important to observe that the conclusions reached herein would appear to strengthen and implement one of the underlying policies which, in the first place, occasioned the enactment of section 117(k) (2) of the 1939 Code and thereafter its successor section 631(b) of the 1954 Code. In general, the approach was one of favoring forest conservation by encouraging the modern trend towards production of timber as a crop under the concept of sustained-yield forest management and to get away from the older concept of "cut out and get out." See Williams, Trends in Forest Taxation, supra, at page 131. Prior to the relief granted by section 117(k), there was a real risk that timber *managed as a crop* might lose its capital asset status, and timber owners therefore tended to sell their timber properties outright without regard to desirable conservation practices. See Rowen, Taxation of Income From Timber Properties, supra, at page 339. Absent specific language in the statute or regulations so requiring, it should not be held that the taxing authority has with one hand granted a special tax benefit to a natural resource industry, but with the other hand has taken back part of the benefit through the medium of disallowing a deduction to which the taxpayer had previously been entitled.[29]

For all of the foregoing reasons, it is recommended that the court enter judgment for the plaintiff on each of its three causes of action, the exact amount of recovery to be determined pursuant to Rule 38(c).

28. In passing, it is not inappropriate to comment on the accounting burden inherent in defendant's contention that plaintiff's selling expenses should be segregated from its forest management expenses and offset against cutting contract proceeds. In another connection, the Supreme Court has had occasion to observe the "practical considerations of accounting convenience which make it as difficult for such dealers, [in the business of buying and selling securities] in many instances, to set commissions off against the proceeds of individual sales as it would be for the merchant of other wares to treat his selling expenses only as a series of subtractions from the selling price realized on particular items of his stock." Spreckles v. Commissioner, 315 U.S. 626, 629, 62 S.Ct. 777, 779, 86 L.Ed. 1073 (1942). Although this plaintiff's principal business is the manufacture of kraft paper, its timber business is of sufficient magnitude to require the employment of a large number of graduate foresters and other employees. (See finding 11, infra.) As stated, their various activities in administering cutting contracts appear to have been merely nominal and incidental to their general forest management duties. An accurate allocation of their time so spent would appear to involve similar accounting difficulties to those which would confront "the merchant of other wares" if he were required "to treat his selling expense only as a series of subtractions from the selling price realized on particular items of his stock." Spreckles v. Commissioner, supra. As Judge Madden remarked in Winn-Senter Construction Co. v. United States, 75 F. Supp. 255, 260, 110 Ct.Cl. 34, 65; "The law, as between the Government and those who deal with it, should be law that it is possible to live by, not merely law that reads plausibly in the books."

29. In his usual felicitous manner, the late Judge Jerome Frank has referred to this principle as the "familiar easy-to-say-so-if-that-is-what-was-meant rule." Commissioner v. Beck's Estate, 129 F.2d 243, 245 (2d Cir., 1942).