Albert G. Rooks and Maud Rooks v. Commissioner. Estate of Stuart B. White, Deceased, William S. White, Administrator with the Will Annexed v. Commissioner.
Albert G. Rooks & Maud Rooks v. Commissioner
Docket Nos. 29716, 29717.
United States Tax Court
1953 Tax Ct. Memo LEXIS 382; 12 T.C.M. (CCH) 96; T.C.M. (RIA) 53036; February 9, 1953
Platt W. Dockery, Esq., 300 Michigan Trust Building, Grand Rapids, Mich., for the petitioners. John L. King, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for 1944 of $5,756.16 against Albert G. and Maud Rooks and $2,311.12 against Stuart B. White. The issues requiring decision are: (1) Whether $17,000 paid by The Niles Creamery Company to its stockholders in May 1944 was taxable as an ordinary dividend; (2) What were the tax consequences of transactions between the stockholders of The Niles Creamery Company and Robert E. Chambers pertaining to the stock of The Niles Creamery Company; (3) Was Rooks the owner of 100 shares or only 80 shares of the stock of The Niles Creamery Company in 1944; and (4) To what normal-tax exemption *383 were the Rooks entitled? Findings of Fact Albert G. and Maud Rooks are husband and wife. Stuart B. White died on November 10, 1950. The returns of the three taxpayers for 1944 were filed with the collector of internal revenue for the District of Michigan. The Niles Creamery Company was incorporated under the laws of Michigan in 1904. Its authorized capital consisted of 250 shares having a par value of $100 per share. Only 220 of its shares were outstanding at times material hereto, of which Albert G. Rooks owned 100, William Saathoff 100, and Stuart B. White 20. There had been no change in the shareholdings since about 1932. The officers of the company prior to May 1944 were Saathoff, President; Rooks, Vice-President and Manager; White, Secretary; and Helen B. Cox, Treasurer. The corporation was engaged in processing, manufacturing and selling milk and other dairy products in Niles and vicinity. The three shareholders entered into an agreement in April 1944 whereby for $50 they granted to Robert E. Chambers an option to purchase all of their stock in the company for $77,000 to be paid in accordance with the terms of a proposed agreement. The option could be exercised at any *384 time up to and including 5 o'clock on the afternoon of May 15, 1944. The three stockholders and Chambers entered into an agreement dated May 10, 1944 in which the stockholders as parties of the first part were called the sellers and Chambers as second party was called the buyer. The sellers agreed to sell all of the stock of The Niles Creamery Company to the buyer "in the manner and for the consideration hereinafter set forth." The agreement provided: "The sellers will immediately and forthwith upon the signing of this agreement declare and pay a capital dividend of the assets of the state corporation to themselves in the sum of seventeen thousand dollars ($17,000.00); which sum is represented by a nine thousand dollar ($9,000.00) savings account, a mortgage in the amount of seven thousand dollars ($7,000.00), which is a lien on the Ailsworth property, and one thousand dollars ($1,000.00) in cash; all of which are assets of the stated corporation." The dividend was to be distributed pro rata to the stockholders, Saathoff, Rooks and White. The agreement further provided that the buyer would pay the sellers $5,000 cash upon the signing of the agreement and a balance of $55,000 *385 in monthly payments of $418 each, beginning one month after the date of the agreement. All payments were to go pro rata to the three stockholders. The agreement recited that receipt of the $5,000 first cash payment "is hereby acknowledged, when proceeds of checks aggregating $5,000 have been received." The buyer was to pay interest semi-annually at 3 per cent on the unpaid balance owed. The agreement further provided: "When the balance of said stock shall be fully paid for, the sellers will transfer the same to the buyer or his assigns, and covenant and agree that during the period of this contract they will not transfer, assign, pledge, encumber, or hypothecate said stock, or any part thereof. "The sellers do hereby tender to said corporation their individual and respective resignations as directors and officers of said corporation." The buyer was given the proxy of the sellers to vote the stock at stockholders' meetings so long as the buyer was not in default under the terms of the contract, but any default was to terminate the proxy. The buyer was given the right to vote the stock to elect directors but the offices of directors and officers were to become vacant immediately *386 upon default. Any dividends declared on the stock during the period of the contract were to be payable to the sellers to the extent of any installments upon the purchase price due and payable for the fiscal year in which dividends were declared but any dividends in excess of such installments were to go to the buyer or his assigns. The provision was said to constitute an assignment of any dividends to be thereafter declared to the extent of the excess. The contract required that land, buildings, machinery and equipment of the corporation be maintained in its then condition and no part thereof could be disposed of without the consent of the sellers. The buyer agreed to operate the business properly on no lower standard than then existed, to continue the policy of prompt payment of accounts, and to cause the corporation to conform and comply with all ordinances, rules, regulations and statutes pertaining to the conduct of the dairy business. The contract was to be rescinded in case of default and any amounts theretofore paid were to be forfeited as liquidating damages, but the buyer would have no further liability. Saathoff, Rooks and White met in White's office as stockholders of *387 the corporation on May 15, 1944. The following is from the minutes of that meeting: "The President announced that an agreement was recently made between the stockholders and one Robert Chambers for the sale of all of the outstanding stock to the said Chambers; that it is provided, among other things, in said agreement, that the stockholders will cause a capital dividend of $17,000.00 to be declared and paid to the stockholders, and that the secretary had advised that a suitable manner of accomplishing this would be to reduce the stated value of the outstanding issued stock from $22,000 to $5,000.00; and then to change the stock to no par value, whereupon the directors could and should declare a liquidating capital dividend of $17,000.00 to off-set, liquidate or absorb the reduction in capital thus accomplished." A resolution was then adopted at that meeting to give the 220 shares of stock a stated value of $5,000. Another resolution was adopted to change the total authorized capital stock to 250 shares of no par value and to have each stockholder surrender his certificate or certificates for cancellation and receive in lieu thereof a certificate for a like number of shares of no *388 par value. The officers were authorized to carry out the resolutions. Immediately after the above meeting, the same three persons met as directors. The minutes of that meeting recite that the stockholders had reduced the stated value of the stock to $5,000 and that, in accordance with the recent sales agreement, "a capital dividend of $17,000 be declared by way of liquidation of such reduction in value of said stock." A resolution was then adopted "that a liquidating capital dividend of $17,000.00 be and the same hereby is declared payable to all stock of record at this date * * *." It was also resolved to issue new certificates of no par value in exchange for the old par value certificates and have the value of the no par value stock stated at $5,000. Saathoff then resigned as president and director and Chambers was elected director and president. The dividend of $17,000 was distributed pro rata to the three stockholders shortly after the above meetings. The exact time is not shown by the record. Rooks received $7,727.27 and White $1,545.46. Chambers, on or shortly after May 15, 1944, made the $5,000 payment provided for in the agreement dated May 10, 1944. The monthly payments *389 for the months of June through November 1944 and the semi-annual interest payment required by the contract were made. The monthly and interest payments referred to were made by checks of the corporation but the record does not show what arrangements, if any, Chambers had with the corporation for the making of those payments. Rooks received $2,272.73 of the $5,000 payment, $1,140 of the monthly payments and $366.95 of the interest payment. White received $454.54 of the $5,000 payment, $228 of the monthly payments and $73.39 of the interest payment. Chambers began to operate the business and continued to operate it until the latter part of November 1944. He operated it very badly, allowed the equipment to become run down and out of order, put out dirty and unsatisfactory products, and lost sources of supplies, customers and employees. The three stockholders, being aware of the situation which had developed under Chambers' management, declared the contract dated May 10, 1944 in default by a written notice to Chambers on November 28, 1944, put themselves back in office and took over the management and operation of the corporation. That terminated the contract and Chambers' connection *390 with the corporation. The stockholders retained the payments theretofore made by Chambers. Rooks and his wife, Maud, filed a return for 1944 which both signed. That return was filed on the basis of cash receipts and disbursements. No income was reported on the return from the transactions had during the year with Chambers, but a rider was attached explaining those transactions and stating that the three stockholders had received their proportionate shares of the $17,000 dividend, of the $5,000 payment made by Chambers, of the six subsequent monthly payments and of the interest payment. White filed his return for 1944 on the basis of cash receipts and disbursements. He did not report any income from the transactions with Chambers but attached a statement identical with that attached to the Rooks' return. The Commissioner, in determining the deficiency against White, held that his share of the $17,000 dividend was taxable as an ordinary dividend and that he had had a capital gain from a sale and repossession which the commissioner explained as follows: (a) Total sales price (taxpayer's share)
$5,454.54
Less: Total cost (taxpayer's share)
0
Profit on sale
$5,454.54
Percent of profit
100%
Cash received during year: Down payment
454.54
Monthly installments (6)
228.00
Total receipts
682.54
Profit realized
Gain taxable under section 117 of
the Internal Revenue Code (50%)
341.27
(b) Basis of installment obligations: Face value ($5,454.54 - $682.54)
$4,772.00
Less: Income returnable if paid in
full
4,772.00
Basis of obligations
0
Gain: Market value of property repos-
sessed: $55,000.00 plus $2,500.00 X 1/11
$5,227.28
0
Total gain on repossession
5,227.28
Gain taxable per Section 117 of the
Internal Revenue Code (50%)
2,613.64
*391 The Commissioner, in determining the deficiency against the Rooks, held that the part of the $17,000 dividend received by Rooks was taxable as an ordinary dividend and that he had realized taxable income of $9,774.55 "from the sale and repossession of assets in lieu of the capital loss reported by you in an indefinite amount." He set forth a computation similar to that set forth in the notice to White except that he allowed Rooks a basis of $10,000 for his stock. The record does not show that Maud Rooks had any income during 1944 or that any part of the income reported on the return for that year was her income. The stipulation of facts, including exhibits attached thereto, is incorporated herein by this reference. Opinion MURDOCK, Judge: The taxpayers, in their returns, took the position that the $17,000 was a part of the purchase price for their stock but the Commissioner held and maintains that it was an ordinary dividend. The petitioners still argue that it was a part of the purchase price but contend as alternatives that it was either a dividend to Chambers or a liquidating dividend to them. The petitioners rely heavily upon their statement in the option that the price *392 of the stock was $77,000 but the agreement shows clearly that Chambers was not to pay $77,000 but agreed to pay only $60,000. The difference of $17,000 was first to be taken out of the corporation by the sellers through a distribution of that amount to themselves as stockholders. They, as stockholders authorized the distribution, as directors declared the dividend, and as stockholders actually received it in proportion to their stockholdings. The agreement dated May 10, 1944, under which they proceeded, and the minutes of the stockholders and directors meetings show clearly that this was a dividend from the corporation to its three stockholders and was not any part of the purchase price which Chambers agreed to pay. The petitioners, in a paragraph which does not go into any detail whatsoever, claim, as an alternative, that it was a liquidating dividend rather than an ordinary dividend. Section 115 (a) defined a dividend as "any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *." The stipulated facts show *393 and it is not disputed that this corporation, during 1944, had accumulated earnings or profits substantially in excess of $17,000 which could have been distributed as an ordinary dividend on May 15, 1944. However, section 115 (c) provided that "amounts distributed in partial liquidation of a corporation shall be treated as in part * * * payment in exchange for the stock." Section 115 (i) provided that "the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." The petitioner has not attempted to show how the $17,000 was a liquidating distribution within that definition and it is not apparent that it was. The words used to describe it by the stockholders and directors in their minutes are not controlling. The device of changing the stock from $100 par value stock to no par value stock and giving the no par value stock a stated value of $5,000 was suggested by White as a convenient way of accounting for the $17,000 distribution. The $100 par value stock was surrendered and cancelled *394 in exchange for no par value stock but there was in that transaction no "complete cancellation or redemption of a part of its stock" within the meaning of section 115 (i). The only change was in the par value of the same 220 shares. The distribution was not one of a series of distributions because it stood all by itself. See also section 115 (g). The record does not show that the Commissioner erred in treating the distribution as an ordinary dividend. , issue I, affd. ; ; , affd. , cert. denied ; ; , affd. . Rooks claims, by an amended petition filed at the hearing, that he did not own 100 shares of the stock in May 1944 but owned only 80 shares since he had given 10 shares to each of his sons in 1932. The evidence does not support his contention that he made gifts of shares to his sons. It does not appear that he ever held a certificate for less *395 than 100 shares or that he ever delivered any certificate to either of his sons. He received one certificate for 100 no par value shares and if any inference may be drawn from the record, it is that he had but one certificate for 100 shares of $100 par value stock. He concedes that the stock was at all times registered in his name alone on the books of the corporation. Dividends were consistently declared on the stock prior to 1944 but it does not appear that Rooks ever turned over any portion of the dividends on his 100 shares to either of his sons. Neither son had any control over the shares of the stock or the certificates and Rooks alone controlled the shares at all times material hereto and acted as the owner of the shares in all of the transactions in 1944. The parties stipulated that Rooks held 100 shares of the stock for more than six months prior to January 1, 1944. One son was not living at the time of the trial but his widow was alive and neither she nor the other son was called as a witness to show that they were even aware of any gifts having been made in 1932. The treasurer of the corporation testified that she knew something about the gifts but she also testified that *396 her connection with the corporation began after 1933 and she did not disclose any first-hand knowledge of gifts having been made in 1932. The record, as a whole, justifies the finding which has been made that Rooks was the owner of 100 shares at all times material hereto. The Commissioner says that he computed the profits of the taxpayers from their transactions with Chambers on the installment basis. The taxpayers did not elect to have their profits computed on an installment basis and the Commissioner now concedes that he erred in making the computation and determining the deficiencies on that basis and agrees that it is proper to make the computations on a cash basis. The three stockholders contracted to sell their stock to Chambers but cancelled the contract within the year and retained the stock. Thus, there was no sale of a capital asset and the amounts received through forfeiture were not actually received from a sale of any asset. It has been held heretofore that a default, such as occurred here, within the taxable year in which the contract was made, makes the amounts received on the contract and forfeited as liquidated damages ordinary income to one on a cash basis. *397 ; . Rooks thus received ordinary income of $3,779.68 and White $755.93 from the defaulted payments in 1944. They had no further income from the cancellation of the contract. The Rooks claim that they are entitled to a normal-tax exemption of $1,000. Section 25 (a) (3) allows a so-called normaltax exemption of $500 but provides in the case of a joint return by husband and wife the normal-tax exemption shall be $1,000 except that if the adjusted gross income of one spouse is less than $500, the normal-tax exemption shall be $500 plus the adjusted gross income of such spouse. There is no evidence that the wife had any income or that the return purported to report any income as her income. Therefore, under no circumstances are the Rooks entitled to a normal-tax exemption in excess of the $500 allowed them by the Commissioner. Decisions will be entered under Rule 50.