GERALD MELONE AND RUTHIE NEWHALL MELONE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 286–64. Filed February 28, 1966.

*Gino P. Cecchi*, for the petitioners.
*Sheldon M. Sisson*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency of $4,933.32 in the income tax of the petitioners for their taxable calendar year 1961.

The issues for decision are:

(1) Whether the petitioners are entitled to deduct an alleged loss of $41,075.56 on the sale in the taxable year by petitioner Ruthie N. Melone to persons named Learner, of residential property which had until May of the preceding year been occupied by said petitioner as her personal residence.

Decision of this issue will turn principally on whether or not said property had, prior to the time of such sale, been converted to any profit-inspired use.

(2) Whether the petitioners are entitled to a deduction for depreciation in respect of the above-mentioned property.

Decision of this issue also will turn principally on whether or not the property had been converted to any profit-inspired use.

(3) Whether an amount of $3,650 which said petitioner Ruthie N. Melone received in the taxable year from persons named Stone, as the result of an out-of-court settlement of a legal action which she had filed against the Stones for breach of an earlier contract with them for

their purchase of the above-mentioned property, constitutes ordinary income to her.

FINDINGS OF FACT

All of the facts of the case have been stipulated; and the stipulation of facts, including all exhibits identified therein, is incorporated herein by reference as our findings of fact. A summary of the pertinent facts so stipulated and found, is as follows.

The petitioners, Gerald Melone and Ruthie Newhall Melone, are husband and wife, residing in Belvedere, Calif. They filed a joint Federal income tax return for the calendar year 1961 here involved, with the district director of internal revenue at San Francisco.

Petitioner Ruthie N. Melone (hereinafter called Ruthie) had been twice married; first to George Newhall who died on July 13, 1958, and then to her present husband, petitioner Gerald Melone, whom she married on September 14, 1960.

Ruthie, upon the death of her former husband inherited from him the residence property involved, consisting of a dwelling and surrounding grounds, which had been included in his estate at the value (exclusive of the household furnishings) of $200,000. Thereafter until about May 3, 1960, Ruthie occupied this property as her personal residence.

In April 1960 while Ruthie was still occupying said property as her personal residence, she listed the same with a real estate broker, for sale but not for rent. Thereafter on May 3, 1960, she entered into an executory contract for sale of said residential property to a corporation, Yerba Buena Development Co., for a total price of $225,000 of which $50,000 was to be paid as the initial downpayment. Said corporation's interest under this contract was thereupon taken over by one of its officers named Robert A. Stone, and his wife, who then paid $20,000 of the purchase price into escrow with a title guaranty company. The Stones took possession of the subject residence property on about July 1, 1960.

Subsequently, the Stones failed to comply with the terms of their purchase agreement, by not paying the additional $30,000 of the $50,000 downpayment; and Ruthie, on February 3, 1961, filed a complaint against them and others in the Superior Court of California, which was captioned "Complaint for Unlawful Detainer of Real Property." In this complaint, Ruthie prayed for restoration of the property to her, and also for damages. The Stones filed an "Answer and Counterclaim" which reaffirmed the original transaction to be one for sale of the property, with no mention being made of any arrangement for rental of the same. As hereinafter shown, said legal proceeding was not finally settled and disposed of until June 28, 1961. In the meantime, the Stones surrendered possession of the property to Ruthie.

On February 16, 1961, which was shortly after the commencement of the above-mentioned legal proceeding, Ruthie again listed the subject property with a real estate broker, for sale but not for rent. And thereafter on February 27, 1961, she entered into an agreement with A. L. Learner and his wife, for sale to them of the subject property together with the furniture therein, for the price of $165,000, of which $50,000 was to be paid as a downpayment and the balance was to be paid in installments over a period of 10 years. The Learners, on the date of this agreement, paid $5,000 into an escrow; and on about March 1, 1961, they entered into possession of the subject property. Because of the pending litigation with the Stones, it was impossible to convey clear title at that time.

Subsequently on April 17, 1961, which was about 1½ months after the Learners had taken possession of the subject property under the above-mentioned purchase agreement of February 27, 1961, they and Ruthie executed another agreement entitled "Agreement for Rental of Real Property," under which the Learners agreed to pay Ruthie a monthly rental of $600 per month for use of the subject property, from the date of such agreement "up to the date on which title is recorded in the name of Learner." Other pertinent provisions of said agreement which indicate the circumstance under which it was executed, and which made specific reference to the above-mentioned purchase agreement of February 27, 1961, are as follows:

WHEREAS, Owner and Learner entered into a written agreement on the 27th day of February 1961, for the purchase of the real property hereafter described; and

WHEREAS, due to the present status of legal title, it is impossible for the Owner to deliver title to Learner, in accordance with the terms of said agreement; and

WHEREAS, it will require a period of time for the Owner to remove the flaw on the title which presently exists thereon; and

WHEREAS, it is the desire of both Owner and Learner that the property heretofore purchased be occupied and rented by Learner until such time as the Owner may be able to deliver satisfactory title thereto.

\*    \*    \*    \*    \*    \*    \*

19. It is hereby agreed and understood that nothing contained herein, nor by the acceptance of the premises, nor by the payment of the rent thereof, in accordance with the terms of this agreement, are the rights of the parties under said agreement dated February 27, 1961, prejudiced, modified or effected [sic]; it being expressly agreed and understood that all rights are reserved thereto and, in the event it becomes impossible for the Owner to deliver title to the said property, it is hereby further agreed and understood that this lease may be cancelled by the Owner by giving thirty days' written notice of her inability to deliver title, at which time Learner agrees to vacate the property, and the leasehold agreement is terminated and thereafter of no force and effect.

Additional facts pertaining to the execution of the above-mentioned "rental" agreement are set forth in a letter from Learner's attorney to the Internal Revenue Service, which petitioners and respondent have

included as part of their stipulation of facts in this case. This letter reads in material part, as follows:

I have examined my file and can state that the $600.00 monthly figure was not arrived at as the rental value of the property. My files indicate the valuation of the property was never considered. The facts which were considered were the costs of maintaining the property, consisting of taxes in excess of $300.00 per month, insurance, etc. As a matter of fact, our file indicates that we originally refused to offer more than $500.00 per month. The figure of $600.00 per month was arrived at by the way of a compromise. I cannot determine from the file as to whether the question of loss of interest on the purchase price was a factor in arriving at the $600.00 figure.

Taxes alone on the property during 1961 were $485.55 per month. Also fire and liability insurance on the property were approximately $40 per month during 1961.

On June 28, 1961, which was approximately 2 months after the above-mentioned supplemental agreement with the Learners was executed, Ruthie and the Stones effected an out-of-court settlement of their litigation; and thereupon the sale contract between Ruthie and the Learners was completed by transfer to the Learners of title to the subject property.

In the said out-of-court settlement between Ruthie and the Stones, the $20,000 which the latter had placed in escrow at the time of their May 3, 1960, purchase contract, was apportioned in accordance with a release agreement. One of the amounts which Ruthie received thereunder was $3,650 "in full satisfaction of any damages plaintiff [Ruthie] may have suffered by reason of the failure of defendants [the Stones] to fulfill or complete the contract mentioned in the complaint [being the above-mentioned sale contract with the Stones of May 3, 1960]."

Ruthie and her husband, in their joint Federal income tax return for 1961, deducted a loss of $41,075.56 from Ruthie's sale of the subject property to the Learners; and they also deducted $3,676.67 as depreciation on said property for 7 months of the year 1961. They did not include as part of the income reported on said return, the $3,650 which Ruthie had received as "damages" under her settlement with the Stones.

The respondent, in his notice of deficiency herein, determined that neither the claimed deduction for loss from sale of the property, nor the claimed deduction for depreciation thereon, was allowable, for the following reasons: That the property had been used by Ruthie as her personal residence prior to being placed on the market for sale; that the above-mentioned supplemental agreement which Ruthie had entered into with the Learners, regarding their occupancy of the property pending the clearance of title, did not convert the property from the status of a personal residence to that of bona fide rental property

held for the production of income; and hence that the claimed deductions for loss and depreciation were not incurred with respect to property used in a trade or business or held for the production of income. Respondent further determined that the "damages" of $3,650 awarded to Ruthie in her out-of-court settlement with the Stones, constituted ordinary income to her.

OPINION

*Issue 1. Deductibility of Loss on Sale of Property*

Section 165(a) of the 1954 Code allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise"; and section 165(c) of said Code further provides, so far as here pertinent, that:

> * * * In the case of an individual, the deduction under subsection (a) shall be limited to—
>     (1) losses incurred in a trade or business;
>     (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

As regards a loss incurred on the sale of residential property, it has long been a settled principle that a loss incurred by a taxpayer from sale of his or her personal residence is not deductible; except where prior to the sale the taxpayer has abandoned the use of the property as his or her personal residence, and has converted the same to a *profit-inspired use*, so as to qualify the loss for deduction under the above-quoted provisions of sections 165(a) and 165(c) (1) and (2). Sec. 1.165–9 (a) and (b), Income Tax Regs; and *Warren Leslie, Sr.*, 6 T.C. 488. In said *Leslie* case, this Court said (p. 493):

> Loss on a personal residence is not deductible for obvious reasons. However, a residence may be abandoned as such and converted to a profit-inspired use from which a deductible loss may be incurred. *Joseph F. Cullman, Jr.*, 16 B.T.A. 991. It must appear that the loss was sustained in the new transaction and was not a carry-over in whole or in part of a loss already incurred in the personal residence use of the property. Cf. *Herbert L. May*, 19 B.T.A. 229. The personal residence use must be terminated, the loss from that use must be fixed in some way, a new basis for gain or loss must be established, and a profit-inspired transaction must be entered into. There must be a showing that the loss was sustained as a result of the new profit-inspired transaction or use. A decline in value during a period while the owner is merely trying to enter into a profit-inspired transaction with the property is regarded as a part of the loss incidental to the personal use, without which the loss would not have occurred. *Frances G. Smith*, 23 B.T.A. 1134. Merely permitting the property to be offered for sale after deciding not to occupy it further is not sufficient to terminate the loss from residential use and initiate a new transaction for profit * * *

In the instant case, the petitioners do not dispute the correctness of the above-stated principles; and they concede on brief, that if the sale transaction with the Stones (the first transaction here involved) had

been completed, any loss which Ruthie might have sustained therefrom "would not have been deductible." They point out however, that during the time that litigation regarding said contract with the Stones was still pending, Ruthie entered into a new sale contract with the Learners on February 27, 1961, under which they made a downpayment and entered into possession of the property on March 1, 1961; and that then, about 1½ months later she entered into a supplemental agreement with the Learners under which they agreed to pay her $600 monthly rental "up to the date on which title [which was then encumbered by the pending litigation with the Stones] is recorded in the name of Learner." Petitioners contend that, the effect of this supplemental agreement with the Learners was that the subject property was thereby converted by Ruthie into a profit-inspired use; and that accordingly the loss alleged to have been sustained by Ruthie on her sale of the property to the Learners, qualifies for deduction under the above-quoted provisions of sections 165(a) and 165(c) (1) and (2) of the 1954 Code.

We do not agree with this contention of petitioners. After considering and weighing all the evidence relevant to the above-described agreements with the Learners, we are convinced, and we here hold, that the second of these agreements—notwithstanding that it was couched in the form of a rental agreement—was in substance and reality merely a supplemental standby arrangement between Ruthie and the Learners who then occupied the premises as contract purchasers, to provide reimbursement to Ruthie for the costs of maintaining the property, including also taxes and insurance, until the pending litigation with the Stones could be terminated—so as to make possible the conveyance of an unencumbered title. Such conclusion is supported not only by the pertinent provisions of said supplemental agreement which we have hereinabove quoted, but also by the pertinent provisions of the explanatory letter of the attorney for the Learners, which we also have quoted. These instruments, in our opinion, make it clear that Ruthie, in entering into said supplemental agreement, did not intend to, and did not, convert the subject property to a new profit-inspired use; and that the alleged loss on the sale transaction with the Learners—which transaction commenced with the execution of the sale contract with them on February 27, 1961, and concluded with the conveyance of title to them on about June 28, 1961—did not constitute either a loss "incurred in a trade or business" or a loss "incurred in any transaction entered into for profit," within the meaning of section 165(c) (1) and (2).

In view of our above holding, it is unnecessary for us to consider an alternative contention of respondent on brief, that petitioners have

failed to establish an adjusted basis for the property as of the time of its alleged conversion to a profit-inspired use.

We decide this first issue in favor of the respondent.

### Issue 2. Deductibility of Depreciation

Section 167(a) of the 1954 Code allows a deduction for depreciation: (1) Of property used in a trade or business, or (2) of property held for the production of income. Such allowance, of course, pertains only to property of a depreciable character—such as buildings or personalty that is so used, and not to realty; and, in the case of a former personal residence, both the conversion of such property to one of the above-mentioned purposes, and also the adjusted basis for the depreciable portions of the property as of the time of such conversion, must be established. See in this connection the previously mentioned provisions of section 1.165–9(b), Income Tax Regs.

Under the prior issue 1, we have concluded and held that the residential property here involved was not converted to any new profit-inspired use. Also petitioners have not attempted to establish any adjusted basis for any depreciable portion of the property as of the time of its alleged conversion to any such use. See *Charles F. Neave*, 17 T.C. 1237, 1243.

Accordingly, we decide this second issue also in favor of the respondent.

### Issue 3. Damages for Breach of Contract

The respondent, as we have hereinabove found, determined in his notice of deficiency that the "damages" of $3,650 awarded to Ruthie in the settlement of the legal action which she had filed against the Stones for their breach of their 1960 agreement to purchase the subject property, constitutes ordinary income to her. Petitioners, on brief, presented no argument or authority to support their allegation of error as to respondent's said determination.

In *Ralph A. Boatman*, 32 T.C. 1188, this Court decided that where, following a vendee's breach of contract to purchase realty, the vendor retained part of the vendee's downpayment as damages for such breach of contract, the amount so retained constituted ordinary income to the vendor. The Court, at page 1191 of its opinon, set forth the following quotation from its prior opinion in *A. M. Johnson*, 32 B.T.A. 156, 161:

> The petitioner proceeds on the theory that the payments of $90,000 and $360,000 were made pursuant to the terms of a contract of sale of the company stock and, hence, related to the disposition of a capital asset held for more than two years. The petitioner's theory is based on a false premise. The payment was made not because of the disposition of a capital asset. It was a payment of liquidated damages for failure to complete a sale.

After the payment the petitioner had exactly the same capital assets as before the transaction was entered into. The entire transaction took place during the taxable year of 1929. Consequently, there is no basis for contending that the $450,000 income arose from the disposition of a capital asset. The income was ordinary income, taxable at the prescribed rates.

On authority of the above-cited cases, we approve the respondent's determination as to this issue.

*Decision will be entered for the respondent.*