**UNITED STATES FREIGHT COMPANY and Subsidiaries**

v.

**The UNITED STATES.**

**No. 138–66.**

United States Court of Claims.

Feb. 20, 1970.

Walter D. Haynes, Washington, D. C., attorney of record, for plaintiff. J. Marvin Haynes, Haynes & Miller, N. Barr Miller, Joseph H. Sheppard, Jerome D. Meeker, and Robert S. Bersch, Washington, D. C., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R.

Miller and Ira M. Langer, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION*

LARAMORE, Judge:

This is an action to recover Federal income taxes paid by the United States Freight Company and its subsidiaries for the year 1960. The issue before us involves the proper characterization for tax purposes of liquidated damages and consultant fees expended by plaintiff [1] during the year under review. The factual context in which this suit arises is detailed below.

The United States Freight Company is a Delaware corporation which maintains its principal office in New York City. It is engaged in the business of furnishing freight transportation services. The company's business includes within its scope domestic freight forwarding, foreign freight forwarding aboard ships, local cartage, truck rental, and freight warehouse operations. As indicated more fully in the findings of fact, the United States Freight Company conducts its business through subsidiary operating corporations. In 1960, the year that is involved in the present litigation, the company utilized 38 subsidiary operating corporations.

Plaintiff utilizes its trucks to pick up shipments at the premises of shippers. In connection with each such shipment, a bill of lading is issued by plaintiff to the shipper, and plaintiff assumes a common carrier's responsibility for the delivery of the freight to the consignee designated by the shipper.

From the premises of the shippers, the shipments are transported by plaintiff's trucks to freight forwarding terminals operated by plaintiff. At the freight forwarding terminals, less-than-carload or less-than-truckload shipments are consolidated into carloads or truckloads.

A carload or truckload of freight is thereafter transported from plaintiff's freight forwarding terminal by a long-haul common carrier (or succession of common carriers) selected by plaintiff to a destination terminal operated by plaintiff in the area where the consignees of the freight are located. At the destination terminal, the freight is unloaded and sorted, and it is then delivered to the designated consignees. The deliveries are effected either by plaintiff in its own trucks or by other truck operators selected by plaintiff.

By 1960, the concept of "through lading" had become basic to plaintiff's operations. Through lading is the transportation of a consignment of freight from origin to destination on one bill of lading, regardless of changes from one form of transportation to another in the course of such transportation. In furtherance of this concept, plaintiff in July 1958 initiated the development and promotion of "containerized" freight and "piggybacking." Containerized freight is freight which is packed in a container of standard size at the point of origin and is then moved to the destination point in the same container, without being unpacked en route even though there may be a transfer from one form of transportation to another. Piggybacking is the transportation of loaded truck trailers or containerized freight on railroad flatcars.

Historically, the railroads had charged separate rates for the various products carried, based primarily on the value of the products rather than on the cost of the transportation. As a result, in the 10 years prior to 1958 the long-haul trucking industry had succeeded in diverting from rail transportation to truck

---

* We are indebted to Trial Commissioner Mastin G. White for his findings of fact, which have been adopted in their entirety, and for his recommended opinion, which has been incorporated herein.

1. For convenience, the term "plaintiff" includes the United States Freight Company and its subsidiaries.

transportation a very substantial portion of the valuable finished products moving in commerce.

In July 1958, plaintiff's president, Morris Forgash, succeeded in convincing the railroads to set a single "freight—all kinds" rate for the rail service of transporting two 40-foot truck trailers or containers on a flatcar, regardless of the value of the products being carried inside. This was advantageous to plaintiff in offering its piggyback service to shippers.

In 1960, there was a substantial increase in plaintiff's containerized shipments to foreign countries. Under this method, goods are loaded in a container unit of standard size at an inland point of origin, and they are subsequently delivered to the overseas consignee in the same container, with no rehandling or platform delays. The shipper receives only one bill of lading. The container is piggybacked by truck, rail, and ship. Transfers from one form of transportation to another are fully mechanized. The costs of export packing are also eliminated. Thus, there is a substantial saving in costs over the conventional method of ocean transportation There is also a substantial saving in the time consumed during the course of the transportation between the point of origin and the final delivery.

Up to and including the year 1960, steamship companies charged separate rates for the various products carried, based primarily on the value of the products rather than on the cost of the transportation. Thus, even if goods were shipped inside sealed containers of standard size, the steamship companies charged rates based upon the contents of the containers. This was disadvantageous to plaintiff, because in its business of "through lading" freight to foreign countries, it would have been very desirable to be able to charge a single rate for the shipment of a container filled with freight, based upon the cost of the transportation and without regard to the nature of the products inside the container.

For several years prior to 1960, plaintiff had tried unsuccessfully to persuade steamship companies to set a "freight—all kinds" rate, similar to the one which plaintiff had convinced the railroads to set in July 1958. Plaintiff's officers asked American flag steamship companies, including American Export Lines, Inc., to set such a rate; and plaintiff's officers traveled to Europe on several occasions to ask foreign flag steamship companies to set such a rate. Plaintiff was turned down by all of the steamship companies which it approached.

Having failed in its efforts to induce the steamship companies to publish a "freight—all kinds" rate, plaintiff decided in 1960 that it would attempt to acquire control of American Export Lines, Inc., for use in its business. American Export Lines was a domestic corporation engaged in the operation of ocean-going vessels for the transportation of freight cargo, mail, and passengers. Plaintiff desired to acquire control over this company in order to establish a "freight—all kinds" rate for water transportation, and in order to introduce a "through lading" service over the routes of American Export Lines to Europe, the Mediterranean Sea, and the Middle East.

Plaintiff had learned informally that it might be possible to purchase from Mrs. Josephine Bay Paul, and from her husband and associates, their stock in American Export Lines. Mrs. Paul owned 236,505 shares of the stock; Mr. Paul owned 5,300 shares of the stock; and a foundation and certain trusts controlled by Mr. and Mrs. Paul severally owned a total of 72,195 shares of the stock. The 314,000 shares of stock referred to in this paragraph constituted approximately 26 percent of the outstanding shares of stock issued by American Export Lines. Plaintiff had ascertained that the ownership of the remainder of the stock was very widespread; that there were no other large outstanding blocks of stock; and that Mr. and Mrs. Paul had nominated the entire Board of Directors of American Export Lines.

Plaintiff believed that if it stood in the place of Mr. and Mrs Paul, it could exercise the same control over American Export Lines which they had been exercising.

Early in February 1960, plaintiff began negotiations in New York City with respect to acquiring the 314,000 shares of stock in American Export Lines referred to in the preceding paragraph. Mr. and Mrs. Paul were represented in the negotiations by Robert W. Bachelor, who was an officer and director of American Export Lines and who had represented Mrs. Paul and her family in business transactions for many years.

At the first meeting between plaintiff and Mr. Bachelor, plaintiff asked Mr. Bachelor, if he could obtain for plaintiff an option on the American Export Lines stock owned by Mr. and Mrs. Paul. Mr. Bachelor replied that the Pauls would never grant plaintiff an option. Mr. Bachelor further stated that in all the business transactions in which he had represented Mrs. Paul and her family, they had never entered into an option, and he was positive that the Pauls would not deviate from that practice.

At the outset of the negotiations, Mr. Bachelor made it clear that Mr. and Mrs. Paul were not offering their stock in American Export Lines for sale, and that they would only consider a proposal in the form of an unsolicited offer from plaintiff to buy the stock. In this connection, Mr. Bachelor took the position that Mr. and Mrs. Paul would not consider any offer involving a price of less than $30 a share, and that it would be a waste of time for plaintiff to offer less than $30 a share. The price of $30 a share reflected some premium above the then-current market price for American Export Lines stock, because the Pauls' stock was control stock.

During the negotiations between plaintiff and Mr. Bachelor, plaintiff retained Elmer G. Gove, a management and financial consultant, to advise plaintiff with respect to certain management and financial aspects of the proposed trans-

action. Plaintiff paid Mr. Gove $2,003.67 for his services.

The negotiations between plaintiff and Mr. Bachelor continued through the month of February 1960 and into the month of March. Finally, by means of a letter which plaintiff addressed to Mr. and Mrs. Paul under the date of March 14, 1960 and which they accepted on the same day, the parties entered into a contract whereby the Pauls agreed to sell their 241,805 shares of American Export Lines stock to plaintiff, and plaintiff agreed to buy the Pauls' 241,805 shares and up to 72,195 additional shares from persons to be designated by the Pauls, all at a price of $30 per share. The letter contract provided that the transaction should be closed at a specified place in New York City not later than April 12, 1960, at which time certificates for the shares of stock were to be delivered to plaintiff in exchange for certified or bank cashier's checks covering the unpaid amount of the purchase price. The penultimate paragraph of the letter contract stated as follows:

> We enclose our certified check for $500,000.00 payable to Josephine Bay Paul, to be applied on account of the purchase price of stock to be sold by her hereunder, and in case this agreement is accepted by you and we subsequently default in performance of this agreement, the said payment of $500,-000.00 is to be retained by Mrs. Paul as liquidated damages; and C. Michael Paul, in consideration of the foregoing, hereby waives any and all rights to damages hereunder in event we subsequently default in performance of this agreement.

The provision of the stock-purchase contract under which plaintiff made a down payment in the amount of $500,000 and agreed that this sum was to be retained by Mrs. Paul as liquidated damages if plaintiff should default in the performance of the contract was insisted upon by Mr. Bachelor when it became apparent that there would be a delay between the date of the signing of the contract by the parties and the closing date.

Mr. Bachelor wrote the language used in the particular contract provision, and previously quoted in this opinion. He selected the $500,000 figure for the down payment—and possible liquidated damages—because he wanted to make it as certain as possible that plaintiff would go through with the purchase of the stock.

After the signing of the contract between plaintiff and the Pauls was announced to the public, plaintiff began to receive very severe criticism of the deal from stockholders, investment companies, investment bankers, and investment counselors. This criticism was intensified after the Dow Jones wire service carried an item on April 6, 1960— or 6 days prior to the final date fixed for the closing of the transaction—to the effect that Admiral John Will, the president of American Export Lines, had issued a statement forecasting unfavorable operations and earnings for 1960 and the immediate future.

At a special meeting of plaintiff's Board of Directors on April 12, 1960, it was resolved not to proceed with the acquisition of any stock interest in American Export Lines under the contract of March 14, 1960 with Mr. and Mrs. Paul. This decision was made because of the adverse criticism of the contract by stockholders and other interested parties, and because of Admiral Will's statement reflecting unfavorable prospects for American Export Lines.

On April 12, 1960, after the action mentioned in the preceding paragraph was taken by the Board of Directors, plaintiff notified Mr. and Mrs. Paul that it was breaching the contract of March 14, 1960. Plaintiff asked the Pauls to return the $500,000 down payment which the plaintiff had made, but they refused to do so.

Pursuant to the terms of the contract dated March 14, 1960, Mrs. Paul retained plaintiff's initial payment of $500,000 on the purchase price of her stock as liquidated damages. Plaintiff considered instituting a suit to recover the $500,000, but concluded that the liquidated damages of $500,000 approximately equaled the damages which the Pauls could prove, and therefore decided that it would be better not to start a lawsuit.

In plaintiff's income tax return for the calendar year 1960, plaintiff claimed as ordinary deductions from gross income the sum of $500,000 which had been paid to and retained by Mrs. Paul in connection with the stock-purchase contract of March 14, 1960, and the sum of $2,003.67 which had been paid to Elmer G. Gove for management and financial advice during the contract negotiations.

In 1963, the Internal Revenue Service assessed a tax deficiency in the amount of $278,242.63 against plaintiff, on the ground that the amounts of $500,000 and $2,003.67 mentioned in the preceding paragraph represented in each instance "a capital loss and not an ordinary deduction." The deficiency, together with interest in the sum of $40,848.33, was paid by plaintiff on August 26, 1963.

A claim for refund was filed by plaintiff on November 15, 1963; the claim was disallowed by the Internal Revenue Service on July 7, 1964. The present action was filed by the plaintiff on May 3, 1966.

Plaintiff asserts that the expenditures in question are fully deductible either as ordinary losses under section 165(a) of the Internal Revenue Code of 1954,[2] or as ordinary and necessary business expenses under section 162. Defendant responds, to the contrary, that any deductible loss sustained by plaintiff is a capital loss under section 165(f) or section 1234. We hold that plaintiff is not limited to capital loss treatment by either of the sections relied upon by the government and, therefore, plaintiff is entitled to recover.

2. All citations to Code sections hereinafter are, unless otherwise indicated, in reference to the Internal Revenue Code of 1954.

I

Section 165(a) provides as a general rule with respect to the deductibility of losses that:

There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Section 165(f) imparts, however, that the allowance of *capital* losses is determined, *inter alia*, by section 1211(a) which provides by way of limitation that:

In the case of a corporation, losses from *sales or exchanges* of capital assets shall be allowed only to the extent of gains from such sales or exchanges. [Emphasis supplied.]

Defendant urges that plaintiff's failure to exercise its stock-purchase contract right and its forfeiture of the down payment as liquidated damages constituted the sale or exchange of a capital asset. We do not agree. Assuming *arguendo* that the bundle of rights possessed by plaintiff under the executory contract to purchase stock comprised a capital asset,[3] that capital asset was not, in our view, sold or exchanged within the meaning of the statute.

Defendant argues that the same principles which govern the character of a buyer's loss on an option to purchase property, and on a purchase and resale of property, must also govern the forfeiture of a down payment as liquidated damages upon the breach of a contract to purchase property. The premise from which defendant proceeds is that it "makes no sense" if a buyer's loss on a breached executory contract to purchase property, which defendant views as lying between an option and a completed purchase, is not a capital loss. Be that as it may, and while we view as questionable the illogic which defendant imputes to such disparate tax treatment, "what makes sense" does not necessarily dictate the definitive answer in the tax area; apparent conceptual niceties often must give way to the hard realities of statutory requirements.

In the instance where property is purchased and then resold, there can be no doubt that a *sale* in its most basic form has taken place.[4] And in the quite different situation where an option to purchase property expires without having been exercised, a specific statutory provision, section 1234(a),[5] supplies the necessary sale or exchange upon which capital loss treatment depends.[6] But in the case now before us, where a contract to purchase property is unilaterally breached by the buyer, the right to purchase being thereby relinquished, and the down payment is forfeited as liquidated damages, we perceive no sale or exchange

3. We consider the substance of our assumption for purposes of argument, that a contract right to purchase what would be a capital asset in the purchaser's hands is itself a capital asset, to be not only reasonable, but also the subject of authoritative support. *See*, Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir. 1962). *See also* footnote 8, *infra*.

4. In this regard, defendant contends that the character of plaintiff's loss is determined by the nature of the loss which would have resulted had the contract been consummated and the stock resold. This contention is without merit. We will not assume to have occurred that which the statute requires in fact, prerequisite to capital loss treatment. This is *not* to say, however, that where on other facts a contract right *is sold* or *exchanged*, the na-

ture of the property underlying the contract and the context in which its exists should not be considered in determining whether the contract right constitutes a *capital asset*.

5. The applicability of section 1234(a) to the case at hand is discussed in detail in the immediately succeeding part of this opinion.

6. Other examples of particular code sections which supply the necessary sale or exchange prerequisite to capital loss treatment include, *inter alia*, the following: § 166(d) with regard to a loss of a noncorporate taxpayer from the worthlessness of a nonbusiness debt; § 1232 with regard to a loss realized upon the retirement of certain evidences of corporate indebtedness; § 1235 with regard to a loss from a particular transfer of a patent right by the "holder" thereof.

in the traditional sense, nor do we understand there to be a statutory provision to satisfy the requirement.

Defendant strongly urges that the rationale of the decision in Turzillo v. Commissioner of Internal Revenue, 346 F.2d 884 (6th Cir. 1965) necessitates our finding a sale or exchange here. We are not so persuaded; we view *Turzillo* as clearly distinguishable from the instant case. *Turzillo*, in its simplest form, involved a taxpayer who possessed a right to purchase stock of his employer-corporation. After his dismissal, a settlement agreement was reached whereby the taxpayer released his stock-purchase right and received therefor the sum of $95,000. The court held that the taxpayer was entitled to treat the proceeds as gain resulting from the sale or exchange of a capital asset. We concur in this holding which, as we view it, recognizes that the bilateral transfer there consummated effectively satisfied the statutory sale or exchange requirement. Compare, Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir. 1962); Commissioner of Internal Revenue v. Golonsky, 200 F.2d 72 (3d Cir. 1952), cert. denied, 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366 (1953). Rather than advancing defendant's position in the instant case, however, our concurrence in the *Turzillo* decision emphasizes, to the contrary, that the unilateral forfeiture here involved does not so satisfy the statute.

We are referred to a well-settled line of decisions which hold that liquidated damages, received by the seller upon the buyer's breach of a contract of purchase, must be reported as ordinary income. *See,* A. M. Johnson v. Commissioner of Internal Revenue, 32 B.T.A. 156 (1935); Albert G. Rooks, 12 T.C.M. 96 (1953); Harold S. Smith v. Commissioner of Internal Revenue, 50 T.C. 273 (1968). Perhaps the nexus between this line of de-

cisons and the *Turzillo*-type case is that a release for a sum by a seller of his contract right to sell certain property (or to have the contract performed), as compared with a sale of the property itself, *does not* constitute the sale or exchange of a capital asset; while the release for a sum by the buyer of his contract right to purchase certain property *does* constitute the sale or exchange of a capital asset. Thus, in the case before us, if the Pauls had decided not to sell the subject stock and, instead, paid a sum to plaintiff for the release of his stock-purchase contract right, we would have essentially the *Turzillo* case and its capital treatment result. But where, as here, the buyer forfeits his down payment (accepted by the seller as liquidated damages in lieu of performance) upon breach and thereby relinquishes, in effect abandoning, his contract right of purchase, there has been no sale or exchange.

Defendant further asserts, in its reply brief, that another well-settled line of decisions typified by Commissioner of Internal Revenue v. Paulson, 123 F.2d 255 (8th Cir. 1941), requires that plaintiff be limited to capital loss treatment.[7] In *Paulson*, the taxpayer contracted in 1923 to purchase a building for $78,000 with an $8,000 down payment, $20,000 payable later in 1923, and $50,000 payable in March 1933 (later extended to March 1936). Upon execution of the contract, the taxpayer "was given possession with an obligation to keep the building in repair, keep it insured, and pay the taxes, and with the privilege of making improvements. * * * While in possession of the building the taxpayer rented it for profit and made valuable improvements." 123 F.2d at 256. Pursuant to the terms of the contract, upon the taxpayer's failure to make the final payment in 1936, the subject property reverted to the seller, who was also entitled

---

7. The other cases cited by defendant as belonging to the *Paulson* line of decisions are: Kaufman v. Commissioner, 119 F.2d 901 (9th Cir. 1941); C. L. Gransden & Co. v. Commissioner, 117 F.2d 80 (6th Cir. 1941); Warren v. Commissioner, 117 F.2d 82 (6th Cir. 1941); Fred A. Bihlmaier v. Commissioner of Internal Revenue, 17 T.C. 620 (1951); Harold R. Smith v. Commissioner of Internal Revenue, 39 B.T.A. 892 (1939).

to retain prior payments. The court concluded that the reacquisition of the building by the seller in satisfaction of the purchase-money indebtedness constituted a sale or exchange and, therefore, the taxpayer was not entitled to deduct the prior payments as an ordinary loss. *See also*, C. L. Gransden & Co. v. Commissioner, 117 F.2d 80 (6th Cir. 1941).

█ In the instant case, plaintiff neither acquired the indicia, nor enjoyed the burdens and benefits, of ownership of the American Export stock. We view the embryonic breach of the executory contract here to be distinctly unlike the breach in *Paulson* of a contract so substantially performed as to have left the seller with little more than a security interest in the subject property. Accordingly, we hold that plaintiff's relinquishment of its stock-purchase contract right and its forfeiture of the down payment as liquidated damages did not constitute a sale or exchange; thus, plaintiff is not limited to capital treatment of the loss which it sustained.

## II

█ Defendant asserts, in the alternative, that plaintiff's loss was a capital loss under section 1234. Albeit there is an important distinction between an option and a bilateral contract in many contexts, defendant urges, there can be *no such distinction for purposes of section 1234.* This is so, defendant continues, because both have the same economic effect. Defendant's position is not well taken.

Section 1234(a) provides, in pertinent part, that:

> * * * [L]oss attributable to failure to exercise a *privilege or option* to buy or sell property shall be considered * * * loss from the *sale or exchange* of property * * *. [Emphasis supplied.]

This section, with no apparent ambiguity, supplies the sale or exchange requirement expressly with respect to transactions involving a privilege or an option; the section makes no reference to transactions involving bilateral contract rights. The legislative history of section 1234, moreover, contains no indication that Congress intended bilateral contracts to be included within the operation of the section. *See* H.Rep. No. 8300, 83d Cong., 2d Sess., A278–79 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess., 437–38 (1954).

That section 1234 is not applicable to bilateral contract rights is further indicated by Morris R. DeWoskin v. Commissioner of Internal Revenue, 35 T.C. 356 (1960), wherein the Tax Court stated at page 363:

> * * * [W]e must point out that "privileges or options" in section 117 (g) (2) [now section 1234] has reference to rights possessed under a unilateral contract, Lawler v. Commissioner of Internal Revenue, 78 F.2d 567 (C.A. 9, 1935); W. A. Drake, Inc., 3 T.C. 33 (1944), aff'd 145 F.2d 365 (C.A. 10, 1944), and is not applicable to losses that arise from failure to carry out bilateral contracts. Therefore *to classify the failure to exercise a right existing under a bilateral contract under section 117(g) (2)* [now section 1234] *is incorrect.* [Emphasis supplied.]

*See also*, Rev.Rul. 58–234, 1958–1 C.B. 279, 281.

There can be no doubt that the stock-purchase right possessed by plaintiff was a bilateral contract right, and not an option or privilege. This court has quoted with approval the definition in 1 S. Williston, Contracts, § 61A at p. 199 (3d ed. 1957), of an option as "the obligation by which one binds himself to sell and leaves it discretionary with the other party to buy * * *." Dynamics Corporation of America v. United States, 182 Ct.Cl. 62, 74, 389 F.2d 424, 431 (1968). The Supreme Court has stated that "[a]n option is a privilege given by the owner of property to another to buy the property at his election." Western Union Telegraph Co. v. Brown, 253 U.S. 101, 110, 40 S.Ct. 460, 64 L.Ed. 803 (1920).

895

The agreement of March 14, 1960 between the Pauls and the plaintiff was not an option, as that term is defined in the preceding paragraph, because it was not discretionary with the plaintiff under the agreement as to whether it would or would not elect to purchase the stock. To the contrary, plaintiff unequivocally obligated itself to purchase up to 314,000 shares of stock, in the following language:

2. We hereby agree to purchase from you [the Pauls] * * * the 241,805 shares owned by you * * * and we agree on the Closing Date to purchase up to 72,195 additional shares of said Stock from persons to be designated by you on or before the Closing Date. All such * * * purchases shall be at a price of $30.00 per share * * *.

It is also clear that the insertion of a provision for liquidated damages in the event of plaintiff's breach did not convert the bilateral contract into an option. This principle was early recognized in Thompson v. Exchange Bldg. Co., 157 Tenn. 275, 8 S.W.2d 489, 60 A.L.R. 693 (1928), wherein it was held:

* * * [T]he mere fact that the contract provides for liquidated damages does not convert the contract of sale into an option, but, in the absence of a provision to the contrary, merely gives the seller the choice of enforcing his full rights against the purchaser, or claiming the amount stipulated as liquidated damages. [Citations omitted.] 8 S.W.2d at 492.

See also, Western Union Telegraph Co. v. Brown, supra.

More recently, the principle was confirmed by W. A. Drake, Inc. v. Commissioner, 145 F.2d 365 (10th Cir. 1944), which involved a bilateral buy and sell contract with a liquidated damages forfeiture clause, the court holding that the contract was a binding agreement to purchase and not a "mere option." 145 F.2d at 367. See also, A. M. Johnson, supra; Ralph A. Boatman v. Commissioner of Internal Revenue, 32 T.C. 1188

(1959). Similarly, in Binns v. United States, 254 F.Supp. 889 (M.D.Tenn., 1966), aff'd, 385 F.2d 159 (6th Cir. 1967), though the contract therein did not contain a liquidated damages provision, the court held with respect to forfeiture of the down payment as liquidated damages upon breach that:

* * * [T]he item in controversy [the forfeited down payment] was not the payment for a lapsed option but a forfeiture in lieu of damages for failure to consummate a contract of sale. 254 F.Supp. at 891.

That the presence of a liquidated damages provision does not convert a bilateral buy and sell contract into an option is further confirmed by an examination of the dissimilar rights and liabilities incident to each. The holder of an option to buy has the truly alternative choice of exercising the option, or allowing it to lapse. See, Fletcher v. United States, 24 AFTR2d 69–5235 (N.D.Ind.1969). If the option is not exercised, the amount paid for the option is forfeited and the optionor is entitled to that amount only, as the optionee was not obligated to perform. The purchaser in a bilateral contract with a liquidated damages provision, if he fails to perform, however, is liable for full contract damages, the liquidated contract amount being a measure thereof only to the extent that it is reasonably so related. See generally, Thomas v. Foulger, 71 Utah 274, 264 P. 975 (1928); Weatherproof Improvement Contracting Corp. v. Kramer, 12 Misc.2d 100, 172 N.Y.S.2d 688 (1956). The compared interests do not have, as defendant suggests, the same economic effect.

We again note, in connection with the option argument, that at the outset of the negotiations plaintiff desired, and sought to obtain, an option from Mr. and Mrs. Paul on their American Export Lines stock, but the Pauls (through their representative) flatly refused to grant an option to plaintiff, and stated that they would only consider an offer from plaintiff to buy their stock outright. Such an offer was ultimately made by plaintiff; it was accepted by the Pauls;

and the result was a bilateral contract which unequivocally bound the Pauls to sell stock and plaintiff to buy it.

■ In accordance with the above-drawn conclusions that section 1234 applies to options or privileges only, and not to bilateral contract rights; that plaintiff possessed the latter; and that the presence of a liquidated damages forfeiture clause did not convert plaintiff's bilateral contract right into an option; we hold that section 1234 is not applicable to the transaction under review. Consequently, plaintiff's loss is not limited to capital treatment thereby but is, instead, fully deductible under section 165(a).[8]

### III

■ As previously mentioned, plaintiff paid $2,003.67 for management and financial advice during negotiation of the contract now under review. Defendant takes the position that this payment, "as an expense of a capital asset transaction, is of the same character." As a result of our holding, however, that there *was* no sale or exchange of a capital asset in this case, the position urged is without foundation. The consultation fee in question is fully deductible from gross income, therefore, as an ordinary and necessary business expense under section 162(a).

In accordance with the above, plaintiff is entitled to recover in the present action, and judgment is entered for plaintiff with the amount of recovery to be determined in subsequent proceedings under Rule 131(c).

DAVIS, Judge (dissenting in part):

My disagreement with Part I of the court's opinion (on § 165(f))—I concur substantially with Part II (on § 1234)—is with the reasoning and not necessarily with the result. The difficulty is that there are two separate lines-of-authority, with divergent tendencies, bearing rather directly on our problem. The one, pressed by the Government, is exemplified by Turzillo v. Commissioner of Internal Revenue, 346 F.2d 884 (C.A. 6, 1965), in which the taxpayer-buyer who received money in settlement of an aborted transaction, comparable to the one we have here, was held to have made a "sale or exchange" and therefore entitled to capital gain treatment.[1] The other group of decisions, put forward by plaintiff, hold that the receipt of liquidated damages by a seller for breach of a contract to purchase stock or other property does not result from a "sale or exchange" and

8. In view of our holding that the forfeiture loss sustained by plaintiff is deductible under section 165(a), we need not decide whether it is deductible, in the alternative, as an ordinary and necessary business expense under section 162. We note in passing, however, that although plaintiff's expenditure was prompted, at least in part, by its desire to implement certain rate policies, there is substantial evidence indicating that the expenditure was also investment-motivated.

1. Other cases cited by the defendant in this connection are: Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (C.A.2, 1962); Commissioner of Internal Revenue v. Golonsky, 200 F.2d 72 (C.A.3, 1952), cert. denied, 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366 (1953); Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 210 F.2d 752 (C.A. 2, 1954), cert. denied, 348 U.S. 829,

75 S.Ct. 53, 99 L.Ed. 654; Commissioner of Internal Revenue v. Ray, 210 F.2d 390 (C.A.5, 1954), cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Metropolitan Bldg. Co. v. Commissioner of Internal Revenue, 282 F.2d 592 (C.A.9, 1960); Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929, 935-936 (C.A.5, 1963); Dorman v. United States, 296 F.2d 27 (C.A.9, 1961). Defendant also puts in this same general category such capital-loss cases as Commissioner of Internal Revenue v. Paulson, 123 F.2d 255 (C.A.8, 1941); Kaufman v Commissioner of Internal Revenue, 119 F.2d 901 (C.A. 9, 1941); C. L. Gransden & Co. v. Commissioner of Internal Revenue, 117 F.2d 80 (C.A.6, 1941); Warren v. Commissioner of Internal Revenue, 117 F.2d 82 (C.A.6, 1941); Bihlmaier v. Commissioner of Internal Revenue, 17 T.C. 620 (1951); and Smith v. Commissioner of Internal Revenue, 39 B.T.A. 892 (1939).

must therefore be treated as ordinary income.[2]

The court's opinion, in opting for the latter rule, distinguishes the *Turzillo* line by saying that in those cases the two parties to the contract settled it by agreement after the breach, while here the liquidated damage provision was included in the contract itself. This is, for me, most unsatisfactory. I cannot see that it should make any difference, for § 165(f) and § 1211(a) purposes, whether the two sides to an uncompleted transaction compromise it by a separate arrangement after the rupture or whether, having foresight, they do it by including a liquidated damages provision in their original contract. In other words, no tax or other useful purpose is served by declaring that this taxpayer has an ordinary loss because it paid $500,000 in liquidated damages to the Pauls under the original agreement to buy-and-sell, but that it would have had a capital loss if the $500,000 had been paid under a settlement reached after the refusal to go through with the purchase.

No other valid distinction has been suggested or has as yet occurred to me. The Government argues that there can be a "sale or exchange" for the breaching buyer in this type of transaction but not for the seller who receives damages and keeps his property. The court's opinion leans toward this view, but to me it seems unacceptable. The concept of a "sale or exchange" necessarily requires two-sided participation, and I cannot see how a transaction can be a "sale or exchange" for the one and something else for the other. See Union Bag-Camp Paper Corp. v. United States, 163 Ct.Cl. 525, 537–539, 325 F.2d 730, 738 (1963); Stoddard v. United States, 49 F.Supp. 641, 644 (D.Mass.1943). When Congress desires an artificial, possibly one-sided, reading of "sale or exchange", it so provides as in Section 1234(a) (b) (loss attributable to failure to exercise a privilege or option).

Thus, my view is that a proper resolution of this case requires us to choose between the divergent groups of precedents, to find in them a harmony which has not yet been discerned, to discover a new but sound principle of "sale or exchange", or to skirt that concept entirely in disposing of the matter. For me much more digging is called for. I know that I do not have the answer now, and in the circumstances it is better simply to record my disagreement with the approach which commends itself to the majority.

2. Taxpayer cites Johnson v. Commissioner of Internal Revenue, 32 B.T.A. 156 (1935); Rooks v. Commissioner, 12 T.C.M. 96 (1953). Knapp v. Commissioner, P–H B.T.A. Memo ¶ 35,427 (1935); Greenleaf v. Commissioner, 9 T.C.M. 1024 (1950); Dexter Sulphite Pulp & Paper Co. v. Commissioner of Internal Revenue, 23 B.T.A. 227 (1931); Mechanic v. Commissioner, 19 T.C.M. 667 (1960); Boatman v. Commissioner of Internal Revenue, 32 T.C. 1188 (1959); Estate of Myers v. Commissioner of Internal Revenue, 18 T.C.M. 1116 (1959), aff'd 287 F.2d 400 (C.A.6), cert. denied, 368 U.S. 828, 82 S.Ct. 48, 7 L.Ed.2d 31 (1961); United States v. Nat'l City Bank, 21 F.Supp. 791, 795 (S.D.N.Y.1937); Melone v. Commissioner of Internal Revenue, 45 T.C. 501 (1966); Binns v. United States, 254 F.Supp. 889 (M.D.Tenn., 1966), aff'd 385 F.2d 159 (C.A.6, 1967); and Smith v. Commissioner of Internal Revenue, 50 T.C. 273 (1968).